## MICHAEL BOURRESEAU v. THE DETROIT EVENING JOURNAL COMPANY.

*Libel—Innuendo—Pleading—Privileged publications—Notice of justification—Practice in circuit courts.*

1. The office of an *innuendo* is to aver the *meaning* of the language published, and if such meaning is *plain* no innuendo is needed, as its use can never change the *import* of the words used, nor *add* to nor *enlarge* their *sense.*

2. Where a newspaper article charged, in *substance,* official oppression, and unwarranted abuse of poor men by the officers of the law, in a certain township, giving *special* instances of such alleged abuse by *other* officers than the plaintiff, who sued for libel, which *general* charge was followed by a *special* instance of abuse by the plaintiff, coupled with a *general* allegation as to the treatment of ragged and poor men by " these *fellows,*"—

63 425
73 422

63 425
79 278

63 425
80 24

63 425
83 591

63 425
84 5

63 425
93 123

63 425
101 283

63 425
107 71

63 425
125 199

63 425
143 1434

63 425
f148 8672

*Held*, that the term "*fellows*" manifestly included plaintiff, without the aid of any innuendo.

*Held*, further, that the average reader knew what the article meant, and the official misconduct therein imputed to plaintiff, and the services of a special pleader were not necessary to explain its meaning to the average citizen out of court; nor was it necessary to inform the court or jury, at the trial, what the publication was about, cr its import in regard to plaintiff's official action in said township.

3. The office of pleading is to make *clear* and *certain* the matters complained of; and when a publication claimed to be libelous has a *clear* and *certain* meaning upon its face, there can be no better pleading than to set out the article in *terms*, and in *full* when all of it is pertinent to the issue; and the addition of an innuendo, when none is necessary, can add nothing to a *clear* perception of its *meaning*, but tends rather to *cumber* and *obscure* it.

4. A publication charging a deputy-sheriff with arresting and handcuffing men without right, and oppressing the poor and friendless under color of his office, charges offenses against humanity and decency, which, if not punishable as crimes under the laws of this State, certainly ought to be. It is clearly libelous, and not privileged, and, if *untrue*, the publisher must respond for the damages done by its publication.

5. The reputation of a public officer cannot be damaged or destroyed, by false imputations upon his morality or honesty, without redress; and it serves no *useful* purpose to the community to *falsely* blacken the character of a public official, or destroy the confidence of the people in his integrity.

6. Where a publication is *plainly* libelous upon its *face*, there is no sound reason in law why the court should not so decide; but if there is any *doubt* as to its *meaning*, so that *extrinsic* evidence is needed to determine its *character* as *actionable* or *non-actionable*, it is the province of the jury, under proper instructions from the court, to determine its *significance*.

7. While the order of proof on the trial of a case is sometimes discretionary, it is not a safe practice to call upon a court to pass upon a proposed statement of fact which is irrelevant unless shown to apply to the opposite party, without at least laying a foundation by showing that the witness can answer as to its application.

8. A *general* justification requires the statements to be proved as alleged in the libel, and not otherwise. *Bailey v. Kalamazoo Pub. Co.*, 40 Mich. 251.

9. Plaintiff was a deputy-sheriff, and sued defendant for an alleged libelous article charging *general* misconduct on the part of the

officers of the township in which plaintiff resided, and connecting him with *one specific* wrongful act. On the trial the testimony of the author of the article as to *general* rumors of official misconduct in said township, but not connected with plaintiff *personally*, was rejected as immaterial.

*Held*, not error; that, as held in *Lewis v. Soule*, 3 Mich. 514, *general* statements of misconduct, not connected with the plaintiff, are not actionable, and that no other rule would be consistent with reason, it being a matter of every-day experience that persons are very apt to use exaggerated language concerning the people of places and neighborhoods which neither they, nor any one else, would regard as injurious to *particular* individuals not specified.

Error to superior court of Detroit. (Chipman, J.) Argued April 13, 1886. Decided November 4, 1886.

Action for libel. Defendant brings error. Affirmed. The facts are stated in the opinions.

*John A. Bell* (*F. A. Baker,* of counsel), for appellant.

*Stewart & Galloway,* for plaintiff.

MORSE, J. This is an action for libel. The article complained of was published in the Detroit Evening Journal in its issue of July 29, 1885.

The whole of it is set out in the declaration, and is reproduced here, including the innuendoes inserted by the pleader:

## "UNWARRANTED OUTRAGE.

"*Danger of Walking Alone in Ecorse and Springwells—Michael Murphy's Experience—A Poor Man Nearly Reaches Friends, When He is Arrested and Imprisoned.*

"Instances of the outrages practiced upon reputable people who may unfortunately pass through the township of Ecorse, by the justices and constables, keep coming to notice. Michael Murphy, who is employed upon a farm about a half mile from the village, upon the river road, was in the city this morning, and relates an event in which he took part. 'One day last June,' said Mr. Murphy, 'and old man came along the road, and I fell into conversation with him. He said he came from the southern part of the State, and was going to Detroit, where he had relatives who would care for

him.   I invited him into the house, and gave him some din-
ner.   In the afternoon the old man started out for Detroit.
I had seen George Allen, a constable, who lives on Sand hill,
watching the old man when he came to the house, so I kept
an eye on him when he went up the road.   The old man
hadn't gone far when Allen started after him.   I saw his
game at once, and started towards them, but Allen got there
first, and arrested the old man for being a tramp.   We had
a hot dispute, but, of course, Allen rushed his man off.   The
next day Allen took the man before Justice Haltiner, and he
was sent up.   That's the way these fellows get their fees, and
it's an outrage.   It's been going on for a long time.'   James
Kelly, a farm laborer, who works near Mr. Murphy, was
with him, and said these occurrences were common.   'Just a
little while ago,' he said, 'I was going to Ecorse, walking
along the railroad.   I had a bag on my arm, and guess I looked
a little like a tramp.   Allen came along, and stopped me,
and asked me a number of questions.   He concluded not to
arrest me after that, but that was what he intended to do.
The other day a man was walking along in front of the
house, and Deputy-sheriff Bourreseau [said plaintiff mean-
ing], who keeps a saloon in Ecorse, came along in his [said
plaintiff's] buggy.   He [said plaintiff meaning] asked the
man if he didn't want to ride.   The man got into the buggy,
and rode towards the village.   He saw something was wrong,
and started to get out, when Bourreseau [said plaintiff mean-
ing] tried to prevent him.   The man, however, jumped out,
and pulled a jack-knife, when Bourreseau [said plaintiff
meaning] grabbed him.   "Let go of me, or I'll stick this
into you," yelled the man at Bourreseau [said plaintiff mean-
ing], who released his hold.   He called to some farm hands,
who came and helped him put the shackles on the man.   I
don't know what became of him, but I suppose he was sent
up.   It isn't safe for an honest man, if he's a little ragged,
or hasn't any money, to walk around Ecorse.   "These fellows
hang around the highways, and arrest every one of them.' "

Under the general issue, the defendant gave notice that it
would insist in its defense:

1. That the article was privileged, the matters therein
mentioned being of great public concern, relating to alleged
abuses practiced by public officials; that before the publica-
tion of the article the doings of some of the officials of the
township of Ecorse, and elsewhere in Wayne county, in the
making of alleged causeless and unwarranted arrests, and in

other alleged abuses of authority, were matters of public comment and discussion; that the defendant, as a public journal, in pursuance of its duty, felt compelled to lay before the public generally the statements gathered by its reporters, in respect of such alleged causeless and unwarranted arrests, and other alleged abuses of authority, to the end that proper remedial measures might and would be adopted; that the article was published in good faith, without malice, and with an honest desire to do the community a service.

2. That the statements contained in said publication of and concerning said plaintiff were true.

Upon the issue thus made a trial was had in the superior court of Detroit, resulting in a verdict and judgment for the plaintiff for $300.

The defendant brings error.

The plaintiff made his primary case by introducing the article complained of, the publication of which was admitted, and showing the circulation of the newspaper. He also testified in his own behalf that he lived at Ecorse, and had held the position of deputy-sheriff since the first of January in that year, and that there was no other deputy-sheriff in Ecorse by the name of Bourreseau; that he had seen the article in the Evening Journal, and that there was no truth in it. He then rested.

Defendant's counsel then moved the court to instruct the jury to render a verdict for the defendant upon the ground that there was no proper innuendo or inducement set forth in the declaration, and nothing for defendant to try, and on the further ground that the article was privileged. The motion was denied, as were also requests to charge in the same direction at the close of the evidence.

The attorney for defendant, in a very able and interesting argument in this Court, showing much research and study, earnestly contends that the article complained of is not libelous *per se* as respects the plaintiff; and therefore the declaration, lacking the necessary innuendo to bring out the latent injurious meaning, does not state a cause of action;

and that, in order to set forth an *actionable* libel, there should have been an innuendo *distinctly* averring that the words, and pointing out the *particular* words, contained in the publication, bore a *specific* actionable meaning.

The office of an innuendo is to aver the *meaning* of the language published.

If the meaning of the publication is plain, therefore, no innuendo is needed. The use of it can never change the import of the words, nor add to nor enlarge their sense.

"An innuendo helps nothing, unless the words to which it is applied have a violent presumption of the innuendo." *Castleman v. Hobbs*, Cro. Eliz. 428.

If the common understanding of man takes hold of the published words, and at once applies, without difficulty or doubt, a libelous meaning thereto, an innuendo is not needed, and would be but useless surplusage in pleading.

The import and meaning of this article in question seems clear to me. In the language of the learned judge, Hon. J. Logan Chipman, who presided at the trial below:

"Taking the head-lines; the introduction to the example given; the instance in which the name of Bourreseau himself is mentioned; the account which follows immediately after it,—all of these render the meaning of the article sufficiently plain. All of these, if the facts stated therein are true, would tend to subject Bourreseau to the highest censure, and when an article does that it is libelous."

The head-lines speak of unwarranted outrages against poor men, and the danger of walking alone in Ecorse. Then, in the body of the publication, instances are given of outrages practiced upon reputable people who pass through Ecorse by the justices and constables therein, and the article proceeds thereafter to state that the plaintiff enticed a man to get into his buggy to ride. The man, after riding some distance, saw something wrong, and tried to get out. Bourreseau attempted to keep him in the buggy. After a struggle, Bourreseau calls some farm hands, and, with their help,

·shackles the poor fellow, and presumably he is sent up; immediately adding to this description of plaintiff's conduct ·these words:

"It isn't safe for an honest man, if he's a little ragged, or hasn't any money, to walk around Ecorse. These fellows hang around the highways, and arrest every one of them."

Here is a distinct and plain charge, in substance, of official ·oppression, and unwarranted abuse of poor men by the officers ·of the law. Special instances of such abuse by other officers are given; then a special instance of abuse by the plaintiff; and then, again, the general allegation as to the treatment of ragged and poor men by "these fellows," which term "fellows" necessarily and manifestly includes the plaintiff, with-·out the aid of any innuendo. The average reader knew what the article meant, and what charge of misconduct was imputed therein to plaintiff, and the services of a special pleader were not needed to explain its meaning to the average citizen ·out of court; nor was it necessary to inform the court or jury, at the trial, what the publication was about, or its import in regard to the action of the plaintiff as an officer in the township of Ecorse.

The office of pleading is to make clear and certain the matters set forth and complained of; and when a publication ·claimed to be libelous has a clear and certain meaning upon its face, there can be no better pleading than to set out the article in terms, and in full when all of it is pertinent to the issue; and the addition of an innuendo, when none is neces-·sary, can add nothing to a clear perception of its meaning, but tends rather to cumber and obscure it.

The publication is plainly libelous. It charges the plaintiff with gross misconduct in office; with arresting and handcuff-·ing men without right; and oppressing the poor and friendless under color of his office of deputy-sheriff,—offences .against humanity and decency, which, if not punishable as ·crimes under the laws of our State, certainly ought to be. It

holds the plaintiff up, if the charges be true, to the scorn and aversion of all honorable men, and the just reproach and censure of good people.

Nor can the article be said to be privileged.  If untrue, the newspaper must be responsible for the damage done by its publication.  The reputation of a public officer cannot be destroyed or damaged, by false imputations upon his morality or his honesty, without redress.  It serves no useful purpose to the community, who are interested, to falsely blacken the character of a public official, or to destroy the confidence of the people in his integrity.  The reason for the privilege, which is supposed to be the accomplishment of the public good by a certain liberty of discussion and publication, cannot be applied to cases where the effect of the exercise of the privilege must necessarily result in public evil as well as private injury. There are cases where the promotion of the public good in a conflict with public evils, existing or to be feared, warrants a freedom of speech and a license in publication, in good faith, which may yet be of injury to private persons, without remedy or compensation to them.

But the distinction between the two classes of cases, and the law of libel upon the subject of privileged publications in this State in relation to public officers and candidates for office, have been heretofore pointed out and elaborated by this Court, and further discussion of the question is unnecessary.  *Foster v. Scripps*, 39 Mich. 376; *Bailey v. Kalamazoo Pub. Co.*, 40 Id. 251; *Bronson v. Bruce*, 59 Id. 467.

It is also contended on behalf of defendant that the court below erred in instructing the jury that the publication was libelous.  It is argued that, while it is within the province of the trial judge to take a case away from the jury when in law it is clearly *not* libelous, yet he has no power to *declare* an article libelous, and, if he thinks it *actionable*, then the question of libel or no libel is for the jury.  We are cited to a large number of English cases as sustaining this proposition.

But we are not prepared to accept such doctrine. If the publication, upon its face, is plainly libelous, and no explanation is needed to determine its character in that respect, there is no sound reason in law why the court cannot decide and rule it to be libelous, as well as upon the other hand to declare it not libelous if its meaning is plainly not actionable. There is no good foundation in a rule that makes any such distinction. If the court has any power to pass upon the question at all, there is no reason for making a one-sided restriction of the authority. The true rule is that if there is any doubt as to the meaning of the publication, so that extrinsic evidence is needed to determine its character as to being actionable or non-actionable, it is then a question for the jury, under proper instructions from the court, to find its significance. If the article itself, standing alone, is plainly libelous, or manifestly wanting in any defamatory meaning, it is the duty of the court to so declare either way, and instruct the jury accordingly. Townsh. Sland. § 286; *Hunt v. Bennett,* 19 N. Y. 173; *Haight v. Cornell,* 15 Conn. 74; *Levi v. Milne,* 4 Bing. 195; *Wagaman v. Byers,* 17 Md. 183; *Pittock v. O'Niell,* 63 Penn. St. 253; *Thompson v. Grimes,* 5 Ind. 385; *Mix v. Woodward,* 12 Conn. 262; *Haire v. Wilson,* 9 Barn. & C. 643; *Fisher v. Clement,* 10 Id. 472.

The defense produced a witness, Gasking, who testified that he lived near Royal Oak, and, in July, 1885, he, with a friend, was in Ecorse looking for work. Just this side of Ecorse, as they were passing along the highway, his friend, who had a hurt leg, sat down to bandage it, and two men came up. He was proceeding to state what took place there, when objection was made to his testimony as immaterial, unless first connected with the plaintiff.

Counsel for defendant then stated that they proposed to show that the two men were arrested by a constable, who handed one of them over to a deputy-sheriff, and both were then taken before a justice, without a warrant, and without

63 MICH.—28.

any occasion for so doing; that they expected to show that the plaintiff arrested the witness; and that men in the township of Ecorse, hunting for work, were arrested without cause. The court excluded the evidence, saying:

"I will exclude it. There is only one charge against the plaintiff here. There is a charge made against the township, so to speak,—that it is not safe down there. But the facts given are specific. I do not find any specific charge of the kind sought to be proven here by this witness. They charge here in this article one specific instance of getting a man into a buggy for the purpose of arresting him. At the end of the article there is a general statement that no man is safe in that township who is ragged and has no money. There is only one specific charge against this plaintiff, and I cannot admit testimony relating to something else, under the statement you make."

It seems to me that so much of the proffered evidence as would have had a tendency to prove that the plaintiff arrested this witness without cause, and without any occasion for probable cause, was admissible to justify the general allegation of the article that the officers in Ecorse were hanging around the highways, and arresting every man who was ragged and had no money, and that plaintiff was one of the fellows who were engaged in such business. It had no tendency, and was not competent, to justify the specific allegation of misconduct against him; but it did have a legitimate bearing to show that he did arrest poor travelers through the township without warrant and without cause. A distinct offer was made by Mr. Baker, one of defendant's counsel, to prove by the witness that the plaintiff arrested the witness. It was error not to permit this.

The plaintiff had counted upon the whole article, which contained a general and a specific charge against him, and he could not restrict the defendant's justification to the specific allegation. *Bathrick v. Detroit Post & Tribune Co.*, 50 Mich. 630, 641. The defendant had a right to establish one charge, or to introduce evidence tending to prove it, even if

it could not justify the whole article.  While it would not prevent a recovery by the plaintiff, it might, and probably would, have a material bearing upon the amount of damages to be awarded.  Townsh. Sland. § 212; *Sullings v. Shakespeare*, 46 Mich. 413.

Fred N. Peck, a witness for the defendant, testified that he wrote the article in relation to plaintiff.  He stated the circumstances under which the publication was made, and testified that he gained his information from two men,— Murphy and Kelly,—whom he understood had just been making complaints to Auditor Moran of the numerous acts of injustice perpetrated in Ecorse.  He asked them to repeat the stories to him, which they did; that he took no further steps to investigate the truth of the stories, and talked with no one but these two men, in the presence of Moran; and the conversation with them was in the forenoon of the same day the article was published.  He was allowed to testify fully, without objection, to the matter of illegal and unjustifiable arrests in Ecorse being a subject of discussion in the newspapers, and among the people of Detroit generally, about the time of the Evening Journal publication.

He was then asked the following questions:

" *Q.* State whether or not it was given out and .the charge publicly made in the newspapers, and by Auditor Moran and others, that people were arrested in that township .without cause, for the purpose of enabling the justices and the officers to get fees against the county; and that one of the justices of the township had adopted the practice of issuing passports, so that they could go about the township without fear of arrest."

Objected to as leading and immaterial, and not allowed.

" *Q.* Were any rumors or charges of that kind made at the county auditor's office?"

Same objection and ruling.

The last question may be technically open to the objection that it is leading, but I think it was competent, as bearing

upon the question of defendant's motive in publishing the article, to show that the charge referred to in the first question had been publicly given out by the newspapers, and by Auditor Moran and others. It was in the same line of the evidence the witness had before that given without question. It was the defendant's right to show all the surroundings connected with the publication of the article, and the knowledge the defendant had when the publication was made. *Huson v. Dale,* 19 Mich. 36; *Scripps v. Foster,* 41 Id. 746; *Sullings v. Shakespeare,* 46 Id. 413; *Bathrick v. Detroit Post & Tribune Co.,* 50 Id. 634.

I find no errors in the charge of the court, which was an able, lucid, and impartial one. The requests of the defendant were all properly refused, except the tenth; and, under the charge of the court, which set forth in what the libel consisted, it is evident the jury did not understand there was any claim made by the plaintiff that he was charged in the article with making arrests for the purpose of obtaining illegal fees.

For the errors in the rejection of proffered evidence, as above stated, I think the judgment of the court below ought to be reversed, and a new trial granted.

CAMPBELL, C. J. We concur in Judge MORSE's views so far as *favorable* to the judgment. In this case the notice of justification contained no *specific* averments, and was confined to the statements in the libel concerning the plaintiff. The only such statement was fully gone into on the trial, and was not made out.

It is now claimed that it was competent, either in justification or mitigation, to prove another act not mentioned in the libel, and not justified. This was attempted in this way: A witness named Gasking was sworn, and testified to his passing through Ecorse with another man, named Carey, and had stated that two men came up, when counsel for plaintiff ob-

jected unless first connected with plaintiff. Defendant's counsel then stated what he proposed to prove concerning an arrest, but did not state he intended to identify plaintiff. It was then suggested by plaintiff's counsel that, if he would ask witness, he would find he did not mean plaintiff. Then, without asking any question as to plaintiff, another counsel said they proposed to show witness' experience in Ecorse, and to show that plaintiff arrested him, and further to show that men hunting for work were illegally arrested, and taken before Justice Haltiner.

The court ruled out the testimony.

It is very questionable whether, even if admissible otherwise, this could be regarded as improperly ruled out. While the order of proof is sometimes discretionary, it is not a safe practice to call upon a court to pass upon a proposed statement of fact which is irrelevant unless shown to apply to the plaintiff, without at least laying the foundation by showing that the witness can answer as to its application. Plaintiff's counsel twice proposed to let witness answer whether plaintiff arrested him. Had this been answered in the negative, it would have ended the inquiry. If answered affirmatively, the other questions concerning the illegality of the arrest, and its admissibility under the issue, would have arisen, and could have been dealt with directly. Experience has shown the mischief of allowing parties to get rulings on matters which the witness may know nothing about, or may know nothing relevant, and it is a practice which deserves no favor.

But this testimony, even if in proper form, was not admissible. It has been decided by our own authorities, and we have no occasion to look further. The practice is settled in this State, as at common law, that it is not competent to prove distinct facts in defense that have not been made part of the issue as framed. No one can be prepared in advance to anticipate every fact, true or false, which may be offered

in evidence, and of which he has had no notice. If this charge had been made in the libel, plaintiff could have had an opportunity to meet it, and also to make inquiry into the character and veracity of the witnesses. It is not pretended that defendant, or the author of the libel, had ever heard of it, and relied upon it when the libel was written. There is no principle which will permit such extraneous specific charges to be gone into for any purpose. *Proctor v. Houghtaling*, 37 Mich. 41; *Fowler v. Gilbert*, 38 Id. 292.

A general justification requires the statements to be proved as alleged in the libel, and not otherwise. *Bailey v. Kalamazoo Pub. Co.*, 40 Mich. 251.

It was not erroneous to exclude the testimony of Mr. Peck concerning general rumors of misconduct in Ecorse not connected with the name of plaintiff. He had in fact been allowed to cover most of this ground, and he had been allowed to give all the rumors and charges he had heard concerning plaintiff, and in this he had given testimony going beyond the established rule that the rumors or reputation must relate to the charge made.

It was held by this Court in *Lewis v. Soule*, 3 Mich. 514, that general statements of misconduct, not connected with the plaintiff, are not actionable, and in the present case the declaration does not count upon any of those statements as ground of action at all. No other rule would be consistent with reason. It is matter of every-day experience that persons are very apt to use exaggerated language concerning the people of places and neighborhoods which neither they, nor any one else, would regard as injurious to particular individuals not specified. If an action of libel would lie for every person because his large or small surroundings are charged as a region of dishonest or bad persons, the results would be startling.

A somewhat similar question arose in *Rosenbury v. Angell*, 6 Mich. 508, where it was held that a general reference for

character to the business men of Penn Yan was too general to allow evidence of inquiries of particular persons. The only possible basis for claiming the relevancy of such testimony would be in mitigation of the general assertions, and they are not legally libelous. ·

It is still more questionable whether such things as were offered could amount,. under any circumstances, to general reputation. The auditor's office is not in Ecorse, and the talk there could not stand on any better footing than gossip in any other office, public or private. It would be very dangerous to permit reputation to be assailed on any such conversation, especially when not naming plaintiff. All that referred to him personally was in fact admitted.

The judgment should be affirmed.

CHAMPLIN and SHERWOOD, JJ., concurred.