[No. 24051.  Department Two.  April 10, 1933.]

G. G. MILES, *Respondent*, v. LOUIS WASMER, INC., *et al.,*
*Appellants.*[1]

*Wakefield & Witherspoon, Turner, Nuzum & Nuzum,* and *Ed. B. Powell,* for appellants.

*C. W. Greenough* and *A. O. Colburn,* for respondent.

MAIN, J.—This action was brought to recover damages for defamatory words spoken over a broadcasting station. The cause was tried to the court without a

[1]Reported in 20 P. (2d) 847.

jury, and resulted in findings of fact from which it was concluded that a recovery could be had. Judgment was entered in favor of the plaintiff in the sum of one thousand dollars, from which the defendants, Louis Wasmer, Inc., Louis Wasmer individually, Charles C. Lantry, and William H. Castner, appeal.

The facts are these: The appellant Louis Wasmer, Inc., is a corporation organized under the laws of this state, with its principal place of business in the city of Spokane, where it owns and operates a broadcasting station known as Station KHQ. The stock of the corporation was owned by Louis Wasmer and Elizabeth Wasmer, his wife, and Mr. Wasmer was the president and general manager thereof. The appellant William H. Castner conducted in Spokane a newspaper known as "Public Opinion", which was devoted to an endeavor to bring about a modification of the Volstead Act and the repeal of the Eighteenth Amendment to the Federal constitution. Lantry was employed by the corporation as an announcer over Station KHQ. The respondent, G. G. Miles, was the duly elected, qualified and acting sheriff of Spokane county.

Prior to July 11, 1931, Castner purchased from the corporation, or rented, time over the radio broadcasting station for the purpose of advertising the publication mentioned. On the morning of July 11, Castner submitted to Lantry a typewritten manuscript to be read over the broadcasting station. Lantry was to amend and alter the manuscript in any manner he saw fit, and announce or read the same, as corrected, over the station. In compliance with Castner's request, Lantry did read the manuscript, as corrected, over the station, and for this purpose was employed and paid by Castner. It was not read on the time for which he was paid by the corporation as an employee.

468

The manuscript, as read, contained the following:

"It's really surprising to know how many good Americans spend their vacations in Victoria and Vancouver. The scenery is just wonderful up there and such water, and the most wonderful golf courses you ever saw. Many of our prohibition friends go there to play golf and quaff the marvelous water, and the prohibition beverages of America don't go down quite so well after one has partaken of the Canadian variety. Here is another thing which might be amusing if it were not so serious. We are about to have a bunch of novice moonshiners working off their poisonous experimental batches on the public. The Spokane sheriff's office recently auctioned off its stock of confiscated stills, home brewing equipment and moonshiners accessories to the highest bidders. What a spectacle! Arresting some moonshiner and confiscating his outfit, then turning around and sell it to someone else at a great discount so they can start up cheap. Seems like a queer proposition, but perhaps the county needs the money. Just why shouldn't the dangerous stuff be destroyed. But if the government sees no harm in collecting income taxes from bootleggers the sheriff can scarcely be blamed for selling moonshine still equipment. Our fifteen minute period is nearly up and we had only begun to tell you what we had in mind, but the remainder will have to keep for another week. This talk, Facts on Prohibition, is broadcast every Saturday evening at 7:30 over Station KHQ Spokane, Washington by PUBLIC OPINION, a monthly publication devoted entirely to the great American issue—PROHIBITION—PUBLIC OPINION gives you the facts. Public Opinion will be very glad to mail you a sample copy without obligation on your part, if you are interested in knowing the truth."

The reading of that manuscript over the broadcasting station is the basis of this action. In the briefs, there is some discussion as to whether the action is one for libel or for slander. This question we shall not decide, because, in so far as this case is concerned, it is immaterial. We shall assume that the words spoken,

if they are actionable, must come within the rule of slander. Inquiry will be directed first as to whether the respondent was slandered by the words above spoken.

Defamatory words spoken of a person, which in themselves prejudice him in his profession, trade, vocation or office, are slanderous and actionable *per se,* unless they are either true or privileged. 36 C. J., p. 1165; *Ecuyer v. New York Life Ins. Co.,* 101 Wash. 247, 172 Pac. 359. Words spoken concerning matters of public interest, such as matters concerning the administration of government, matters relating to the management of public institutions and local authorities and matters pertaining to the administration of public justice, are within the rule of qualified privilege, if true. In *Wilson v. Sun Publishing Co.,* 85 Wash. 503, 148 Pac. 774, Ann. Cas. 1917B, 442, it was said:

"Matters of such public interest as fall within the rule of qualified privilege are classified in Newell on Slander and Libel (2d ed.), p. 576, as follows:

" '(1) Matters concerning the administration of the government. (2) Matters pertaining to the administration of public justice. (3) Matters relating to the management of public institutions and local authorities. (4) Matters relating to appeals for public patronage. (5) Matters concerning literary publications, books and pictures. (6) Matters concerning the character and quality of public entertainments. (7) Matters relating to religious bodies, churches and associations.' "

Words spoken, however, which are not in fact true, are not privileged, because, as stated in *Graham v. Star Publishing Co.,* 133 Wash. 387, 233 Pac. 625,

"The privilege ends when falsity begins, and if, as the complaint alleges, the charge is false, the privilege, if there was one, was therefore exceeded."

In determining whether the words spoken were defamatory, they must be construed in the sense in which

470

they would ordinarily be understood by persons hearing them. *Bourreseau v. Detroit Evening Journal Co.,* 63 Mich. 425, 30 N. W. 376, 6 Am. St. 320; *Washington Post Co. v. Chaloner,* 250 U. S. 290.

We shall now take up the language in the article read over the broadcasting station and determine whether, under the rules of law stated, they were defamatory of the respondent in the performance of the duties of his office as sheriff. It will be observed that the article says that we are about to have a bunch of "novice moonshiners" working off their poisonous experimental batches on the public. This is followed by a statement that the sheriff's office recently auctioned off its "stock of confiscated stills, home brewing equipment and moonshiners accessories" to the highest bidder. Then attention is called to the so-called spectacle of arresting a moonshiner, confiscating his outfit, and then turning around and "sell it to someone else at a great discount so they can start up cheap." The query is interposed as to why the dangerous stuff should not be destroyed.

The ordinary person hearing these words over the radio would naturally come to the conclusion that the respondent, as sheriff, was consorting with moonshiners, confiscating their outfits, and then selling them at public auction at a reduced price, thereby aiding in creating a bunch of "novice moonshiners." That such language, if not true, is defamatory of the respondent in the performance of the duties of his office, can hardly be questioned. That the statements made were intended to be made as facts, is enforced by the concluding portion of the article which refers to "this talk" as "facts on prohibition."

The charge that the respondent confiscated stills and sold them as such, thereby aiding in the creation of "novice moonshiners," was, in fact, not true. The

evidence shows, and the court found, that the respondent, after confiscating a still, broke it up and destroyed it as such and sold it as copper or junk under the law and under an order of court. There is no intimation in the spoken words that the sheriff was acting under the law and in pursuance of a court order, and that the stills had been broken up and destroyed as such prior to the sale. The statements made, being, in fact, not true, and being defamatory of the respondent in the performance of the duties of his office, were slanderous *per se,* and did not fall within the rule of qualified privilege.

The words spoken not being privileged, it was not necessary for the respondent to allege and prove malice, inasmuch as he was not claiming special damage, but was only seeking to recover general damages. *Hollenbeck v. Post-Intelligencer Co.,* 162 Wash. 14, 297 Pac. 793.

It is further contended that the court erred in restricting the cross-examination of a witness called by the respondent. The witness, a deputy sheriff, in his examination in chief testified that the stills were broken up, destroyed and sold as copper. On cross-examination, this was repeated, and then he was asked whether the stills were smashed up so entirely that they could not be rehabilitated. Objection was made to this question and sustained. But we see no error in that regard. The scope of the cross-examination of a witness rests largely in the sound discretion of the trial court, and such discretion was not here abused. In addition to this, even though the question had been permitted to be answered and the witness had answered it in the negative, it would not be of controlling importance in the disposition of the case.

This brings us to the question of the persons liable. There can be no question about the individual

liability of Castner, who prepared the article, paid for the time over the broadcasting station, and employed Lantry to read it. Lantry likewise would be liable, because he not only spoke the words over the station, but assisted in editing the article which was thus read. As to the appellant Louis Wasmer, Inc., it seems to us that there is a close analogy between the words spoken over a broadcasting station and libelous words contained in a paid advertisement in a newspaper. The owner of the station furnished the means by which the defamatory words could be spoken to thousands of people. It operated the station for profit, and received compensation for the time that it was being used. The question is new, and there appears to be a dearth of authority upon it.

So far as we are informed, the supreme court of Nebraska is the only court that has spoken upon the question. In the case of *Sorensen v. Wood*, 123 Neb. 348, 243 N. W. 82, it was held (the court there treating the words as libelous) that an owner of a broadcasting station was liable for defamatory words spoken over it. It was there said:

"It has often been held in newspaper publication, which is closely analogous to publication by radio, that due care and honest mistake do not relieve a publisher from liability for libel. In *Peck v. Tribune Co.*, 214 U. S. 185, Mr. Justice Holmes said: 'If the publication was libelous the defendant took the risk. As was said of such matters by Lord Mansfield, "Whatever a man publishes he publishes at his peril." ' In *Taylor v. Hearst*, 107 Cal. 262, where the published article was libelous *per se* but the publisher made a mistake in the initials and intended the article to apply to another person, it was held: 'Whether such publication was by design, or was the result of carelessness in setting the type, is a matter of no consequence so far as the question of actual damages is involved.' In the argument in *Walker v. Bee-News Publishing Co.*, 122 Neb.

511, are cases to the same effect. So the instructions were erroneous in not clearly and unequivocally defining the libelous *per se* statements as such. The court also erred in submitting the case to the jury by instruction No. 8½, as if the law of negligence and not the law of defamation were the underlying basis for liability of radio broadcasting licensees for the publication of defamatory utterances by radio. These errors were prejudicial and require a reversal of the judgment.

"The defendant company, like most radio broadcasters, is to a large extent engaged in the business of commercial advertising for pay. It may be assumed this is sufficient, not only to carry its necessarily large overhead, but to make at least a fair return on its investment. For it appears that the opportunities are so attractive to investments that the available airways would be greatly overcrowded by broadcasting stations were it not for restriction of the number of licensees under federal authority. Such commercial advertising is strongly competitive with newspaper advertising because it performs a similar office between those having wares to advertise and those who are potential users of those wares. Radio advertising is one of the most powerful agencies in promoting the principles of religion and of politics. It competes with newspapers, magazines and publications of every nature. The fundamental principles of the law involved in publication by a newspaper and by a radio station seem to be alike. There is no legal reason why one should be favored over another nor why a broadcasting station should be granted special favors as against one who may be a victim of a libelous publication."

It seems to us that the views there expressed are sustained by reason.

The judgment will be affirmed.

BEALS, C. J., STEINERT, MILLARD, and TOLMAN, JJ., concur.