[No. 32741. *En Banc.* January 7, 1955.]

CLIFF YELLE, *et al., Appellants,* v. COWLES PUBLISHING COMPANY *et al., Respondents.*[1]

[1]Reported in 278 P. (2d) 671.

*Bassett, Geisness & Vance* and *Stephen V. Carey,* for appellants.

*Witherspoon, Witherspoon & Kelley, Tanner, Garvin & Ashley,* and *Wright, Innis, Simon & Todd,* for respondent.

SCHWELLENBACH, J.—This is an appeal from a judgment dismissing a civil action for libel after an order had been entered sustaining a demurrer to the amended complaint, and plaintiffs had refused to plead further.

In July, 1951, Cliff Yelle was state auditor of the state of Washington, and Jack Taylor was land commissioner. They, together with Governor Arthur B. Langlie, constituted the state capitol committee and, as such, were intrusted with the duties, among other things, of formulating plans for the construction of a state office building in Olympia and negotiating, on behalf of the state, contracts for designing and constructing such building.

The Cowles Publishing Company is a corporation engaged in publishing a daily and Sunday newspaper called "The

Spokesman-Review," which is distributed and circulated throughout the state of Washington. James Bracken is its editor.

July 31, 1951, the Review published the following editorial:

### "Yelle and Taylor Squander Money

"The architect selected to design the new $2,450,000 state office building at Olympia has a lucrative assignment, one that was eagerly sought by other men in the profession.

"It is customary for the state and its subdivisions to pay a fee of 6 per cent of the construction cost to the designer, according to Governor Langlie and other state officials who have supervision of building contracts. Nevertheless, State Auditor Yelle and Land Commissioner Taylor contracted to pay a fee of 7½ per cent to the Tacoma architect who will plan this building.

"They maintained their resolve to pay this higher fee despite strong protests by the governor and a declaration by the state education board that it would not change its policy of limiting architectural fees to 6 per cent for school construction.

"The two officials, who represent a majority on the state capitol committee, defended their action by saying the Washington chapter of the American Institute of Architects approved the rate.

"They offered additional reasons—that some of those who bid to do it at 6 per cent did so too late, and that 'building costs have doubled in recent years, consequently architects' gross fees have increased relatively.'

"The reasons do not sound sufficiently strong to justify this extra distribution of the taxpayers' money. No matter how skillful the architect selected, having him on the job cannot be nearly as important to the state in the long run as maintaining the going rate of payment which has applied to all public construction.

"To be sure, architects may expect increased dollar incomes in this era of higher costs for everything, but as long as they are paid 6 per cent their incomes from state jobs will go up exactly as fast as do costs for everything else involved in erecting a building.

"Unless Auditor Yelle and Land Commissioner Taylor can produce better arguments than have been so far reported, their action must be considered by the taxpayers as an unnecessary and culpable squandering of state funds."

Paragraph IV of the amended complaint alleged:

"On the 31st day of July, 1951, the defendants published, or caused to be published, a defamatory and damaging editorial in the first column of the editorial page of said newspaper concerning the plaintiffs, and each of them, falsely stating that, as two of the three members of said State Capitol Committee, they had selected a Tacoma architect and contracted on behalf of the State of Washington, to pay him for designing a certain State office building to be constructed at Olympia at a cost, asserted by the defendants to be $2,450,-000.00, a fee of seven and one-half per cent of said construction cost, whereas it was 'customary' for the State to pay a fee of only six per cent of the construction cost to the architects of State buildings; and falsely charging that the plaintiffs had 'contracted' to pay such higher fee to said architect despite the strong protest of the Governor of the State of Washington, the third member of said State Capitol Committee, characterizing the plaintiffs' alleged act and contract 'an extra distribution of the taxpayers' money' and 'an unnecessary and culpable squandering of State funds' thereby imputing to the plaintiffs, and each of them, misconduct in their respective offices, want of official integrity and fidelity to public trust, and wicked, corrupt and selfish motives. A true and correct copy of said editorial is attached hereto as Exhibit 'A' and made a part hereof by this reference."

The trial court held that the above publication did not constitute libel *per se*. As special damages are not alleged, the question for determination is whether or not this holding was correct.

Section 1, chapter 117, Laws of 1935, p. 329 [*cf.* RCW 9.58.010]. defines libel as:

"Every malicious publication . . . which shall tend:—
"(1) To expose any living person to hatred, contempt, ridicule or obloquy, or to deprive him of the benefit of public confidence or social intercourse; . . ."

Malice is not an essential element of civil libel. Aside from that, a publication proscribed as criminal libel in the above statute, in so far as it pertains to living persons, constitutes libel *per se*. *Ziebell v. Lumbermen's Printing Co.*, 14 Wn. (2d) 261, 127 P. (2d) 677; *Gaffney v. Scott Pub. Co.*, 35 Wn. (2d) 272, 212 P. (2d) 817.

Defamatory words spoken of a person, which in themselves prejudice him in his profession, trade, vocation, or office, are slanderous and actionable *per se*, unless they are either true or privileged. Words spoken, however, which are not in fact true, are not privileged. *Miles v. Louis Wasmer, Inc.*, 172 Wash. 466, 20 P. (2d) 847.

In the above case, we stated:

"In determining whether the words spoken were defamatory, they must be construed in the sense in which they would ordinarily be understood by persons hearing them."

In *Ziebell v. Lumbermen's Printing Co., supra*, we said:

"With reference to defamation of a public officer, we quote the following from 3 Restatement of the Law of Torts, p. 177, § 573:

" 'One who falsely and without a privilege to do so, publishes a slander which ascribes to another conduct, characteristics or a condition incompatible with the proper conduct of his lawful business, trade, profession, or of his public office whether honorary or for profit, is liable to the other.

" 'Comment: [b, p. 178] The rule stated in this Section is applicable to public officers, whether executive, administrative, judicial, or legislative officers and whether of the city, state, or national government and to candidates for such an office irrespective of present incumbency. It is immaterial whether the office is honorary or for profit.'

"It should be noted that, while the rule of the foregoing section pertains to *slander*, it is expressly stated in the comment (e, p. 168) under § 569 that the rule is applicable also to the *libel* of a person in his business, profession, or office.

"This court has often held that a publication which imputes to a public officer entrusted with a position of public interest charges of misconduct in office, want of official integrity or fidelity to public trust, is libelous *per se*. *Byrne v. Funk*, 38 Wash. 506, 80 Pac. 772; *Quinn v. Review Pub. Co.*, 55 Wash. 69, 104 Pac. 181, 133 Am. St. 1016; *McKillip v. Grays Harbor Pub. Co.*, 100 Wash. 657, 171 Pac. 1026; *Miles v. Wasmer, Inc., supra*. In *Quinn v. Review Pub. Co., supra*, the following is quoted with approval from Newell, Defamation, Slander & Libel, p. 69:

" ' "So too, it is libelous to impute to any one holding office that he has been guilty of improper conduct in office, or has been actuated by wicked, corrupt, or selfish motives." ' "

[4] Was the publication libelous *per se?* In considering this question, we must not be influenced by the fact that the plaintiffs, in their complaint, conclude that it was libelous. The test is, did a portion of the reading public ordinarily and reasonably consider it to be libelous. What implication did they get from reading it? *Ziebell v. Lumbermen's Printing Co., supra.*

"Culpable" is defined in Webster's New International Dictionary, Second Edition (1937), as follows:

"1. Guilty; Criminal. *Now Rare.*
"2. Deserving censure or moral blame; faulty; immoral.
"Syn.—Censurable, reprehensible, blameworthy.
"Ant.—Commendable."

We must not be guided entirely by what Webster says that "culpable" means, but by what the average reader of "The Spokesman-Review" thinks that it means. What impression did that word, used as it was in the editorial, make on him? He may not have considered it as criminal, but he may have considered it under the circumstances as a violation of a public trust.

In *McKillip v. Grays Harbor Pub. Co.,* 100 Wash. 657, 171 Pac. 1026, an action for libel was commenced by the county superintendent of Grays Harbor county against the "Aberdeen Daily World" for publishing the following advertisement:

"(Paid Advertisement)
"Paid for by friends of T. W. Bibb, Republican Nominee for County Superintendent of Schools.

"We, the undersigned voters of Grays Harbor county, hereby publicly express our complete confidence in T. W. Bibb, republican candidate for superintendent of schools, and commend him to the voters of this county as worthy of their support. We wish also to publicly denounce the campaign of abuse and slander being waged against him by N. D. McKillip, his opponent, and we warn all loyal friends of the public schools of this county not to be misled thereby. Over and above many other disqualifications which, in our judgment, render McKillip unfit for this important office, his conduct in thus waging a campaign of slander and lies against an honorable opponent, brands him as unworthy of the office he seeks. Let all true men and women who like

to see fair play, place the seal of disapproval on McKillip's vicious methods by rallying to the support of that clean and deserving young man, T. W. Bibb. We vouch for his honesty and for his honor." (Aberdeen Daily World, November 6, 1916.)

The trial court sustained a demurrer to the complaint and dismissed the action. Upon appeal we reversed, holding the action to be libelous *per se*. We said:

"The article clearly charges the appellant with moral delinquency. The charge, in effect, is that he unlawfully lied about an honorable opponent. To a man of normal sensibilities this is a most grievous charge. That it tended to deprive the appellant 'of the benefit of public confidence' is not open to doubt, because honest men instinctively shun a liar."

■ In the instant case, the trial court was of the opinion that the editorial merely charged the defendants with being extravagant, inefficient, and not economical. We do not believe that the average reader of the The Spokesman-Review would imply such a charitable purpose to the editorial. Here were two important state officials who, as a majority of the state capitol committee, were responsible for spending millions of dollars of the taxpayers' money. As members of that committee, they held positions of trust. It is true that people have become somewhat calloused towards enormous spending of public funds. Nevertheless, realizing the precarious condition of the state's finances, as they did in 1951, they would be shocked to learn that these two state officials, holding such positions of trust, would resort to "an unnecessary and culpable squandering of state funds." The editorial imputed to appellants a want of official integrity and fidelity to public trust, and it tended to deprive them "of the benefit of public confidence." It was libelous *per se*.

■ Respondents contend that, even if the publication were libelous, it was privileged as constituting fair comment. In urging that this question was raised by the demurrer, they rely upon *Arnold v. National Union of Marine Cooks & Stewards Ass'n*, 36 Wn. (2d) 557, 219 P. (2d) 121, wherein we said:

"Respondents contend that under the circumstances the letters were privileged. This question may be raised by demurrer where privilege is clearly shown on the face of the complaint. Otherwise, it must be raised by answer."

Clearly, a conclusion based on premises alleged to be false would not warrant the question of privilege of fair comment to be raised by a demurrer. That question must be raised by answer.

In the present case, the trial judge was of the view that the complaint did not allege falsity. He stated in his memorandum opinion:

"True, by the complaint a portion of the facts from which the conclusion is drawn are denied. But not in toto, and the denials, limited as they are, would seem to constitute negative pregnants."

■ To deny the truth of a statement, may reach the same result as to allege its falsity. Nevertheless, we are here concerned with a libel action where plaintiffs affirmatively allege that certain statements contained in the editorial were false. If defendants were in doubt as to just what statements were alleged to be false, they could have moved to make the complaint more definite and certain. Instead, they chose to demur to the complaint, thus admitting, for the purposes of the demurrer, the truth of the allegations contained therein. At the trial, of course, the plaintiffs must sustain the burden of proving such allegations. We are satisfied that the amended complaint did allege that certain statements contained in the editorial were false.

The judgment appealed from is reversed, and the cause is remanded with direction to overrule the demurrer.

GRADY, C. J., MALLERY, HAMLEY, and OLSON, JJ., concur.

HILL, DONWORTH, WEAVER, and FINLEY, JJ. (concurring in the result)—Since this case is before us on a demurrer to the complaint, we must accept as true the allegations contained therein in determining whether a cause of action is stated. Also, we must give appellants the benefit of the most favorable inferences that may be drawn therefrom. *Wilkinson v. Tacoma*, 39 Wn. (2d) 878, 239 P. (2d) 344.

The complaint alleges that the following statements of fact contained in the editorial *are false*: (1) that appellants selected a Tacoma architect to design a state office building; (2) that they contracted on behalf of the state to pay him a fee of 7½ per cent for designing a building to cost $2,450,-000; (3) that it was customary for state agencies to pay a fee of only 6 per cent to architects for such services; and (4) that appellants had contracted on behalf of the state to pay the architect the higher fee of 7½ per cent despite the strong protests of the governor.

Under these allegations of falsity, we are compelled to assume that the comment of the editorial writer that appellants' action "must be considered by the taxpayers as an unnecessary and culpable squandering of state funds" has no basis in fact whatsoever. For our present purposes, we must, therefore, assume that no such transaction as that described in the editorial ever took place.

That being the case, there can be no question but that the comment is libelous *per se* because the word "culpable" may well have been understood by some readers as imputing to appellants conduct which would tend to deprive them of the benefit of public confidence.

We therefore concur in the result of the majority opinion.