[No. 28519.    Department One.    July 17, 1942.]

A. G. ZIEBELL *et al., Appellants,* v. LUMBERMENS PRINT-
ING COMPANY, INC., *et al., Respondents.*[1]

*Houghton, Cluck & Coughlin* and *Mervyn F. Bell,* for
appellants.

*Tyre H. Hollander* and *Hyland, Elvidge & Alvord,*
for respondents.

[1]Reported in 127 P. (2d) 677.

DRIVER, J.—This is an action for libel. Three separate demurrers, interposed by defendants to the amended complaint, were sustained. Plaintiffs declined to plead further, and the court entered its order dismissing the action. This appeal followed. For convenience, A. G. Ziebell will be referred to in this opinion as though he were the only appellant.

The amended complaint alleged, in substance, that appellant was one of the commissioners of public utility district No. 1 of Snohomish county and also the president of the Puget Sound utility commissioners association, a voluntary association composed of the commissioners of public utility districts located in the portion of the state served by the Puget Sound Power and Light Company; that such association constituted a medium through which the public utility districts were attempting to negotiate for the purchase of the electrical properties of the power company; that, in conducting such negotiations, the districts were represented by a committee known as the Puget Sound negotiating committee, of which appellant was a member and the chairman.

That, at the time of the publication of the newspaper article in question, appellant was entrusted with the duty of formulating and recommending plans for effecting the purchase of the power company's properties and, also, for the raising of the requisite funds by means of revenue bonds to be issued and sold by the several utility districts concerned; that one of the most important markets for such bonds existed among certain investment and bond brokerage firms with offices on or near Wall street in New York city, and commonly and popularly referred to as "Wall street"; that other private financial institutions, not connected with Wall street, and the United States Reconstruction Finance Corporation were also potential purchasers of

such bonds; that, in order to market the districts' bonds on the most advantageous terms and to obtain the lowest interest rates, it was appellant's duty to keep himself free from the domination, control, or influence of any possible purchaser so that his investigation and report would be strictly objective and impartial, and that all such matters were well known to appellant's constituents and to the public generally, including the readers of the article in question.

That, in publishing and circulating the newspaper article, respondents charged, and were understood by readers of the article generally to charge, appellant with improper conduct in office and with being actuated by wicked, corrupt, and selfish motives, in that he was actually and admittedly the agent of and working for the benefit of a potential group of purchasers of the districts' bonds, the interests of which were adverse to those of the districts which appellant represented, thus imputing to appellant a course of double dealing; and that all statements made concerning the appellant in such newspaper article were false.

The article which, according to the allegations of the amended complaint, the respondents caused to be published in a weekly newspaper in Seattle, reads as follows:

"P. U. D. PROBE

"Grange News, local farm paper and ardent advocate of the Wall-Street-sponsored PUD's suggests a state investigation of possible 'power trust' activities in connection with Initiative 139. This paper heartily approves such a move, and joins Grange News in urging action thereon by the State. We agree with Grange News that there is no lack of evidence bearing on the subject. Some of this evidence appeared in Grange News itself not long ago, when a Mr. Ziebell, head of the P. U. D. Commissioner group, got mad at Wall-Street-Wangler Guy C. Myers long enough to expose some of Myers' skullduggery in putting over

Utility Districts. He also told why it was being done. By all means, let Mr. Ziebell and Mr. Myers, confessed tools of Wall Street, be the first witnesses.

"Next let's find out who's back of this State Grange anti-popular-vote campaign. All initiative 139 would do is to submit P. U. D. bond issues to a vote of the people. Just why and on whose behalf and for what consideration are Grange officials opposing so wholly democratic a procedure? Certainly not for farmers, since to an average farmer his power and light bill is so minor an item that, even if he got it free, he wouldn't be helped much. If not for farmers, then for whom are the Grange bosses working?

"As we start our probe, let's look over an average issue of Grange News, about half of whose reading space is devoted to opposing popular votes on P. U. D. expansions. Let's find out who pays for the full page ads of the 'Washington State Grange Power Committee.' Let's find out who constitute and who controls that committee. Does it consist of farmers, or of stooges for the Power Trust? Are its members actually friends of public power, or are they some of the Myers and Clucks whose connections with Wall Street the Grange News itself has exposed? Let's find out why just about the only real advertising contract in the Grange News is that of Puget Sound Power and Light Co. Let's ask ourselves if, just possibly, there isn't a pretty smelly nigger in this PUD woodpile. Let's even look into the possibility that the Grange officers and paper, wittingly or otherwise, may be mere tools or dupes employed to put over a 'sellout' of our publicly owned power system that will make the smelly old Seattle streetcar deal look like a Saturday bargain special by contrast.

"Getting well under way, let's look into a few of these PUD's themselves, about which so much boasting is done. Let's find out why the Grays Harbor P. U. D. bought out a private plant at a price ($2,800,000.00) which the State Department of Public Service had previously found was 'watered' to the tune of a half million dollars. Let's ask why, to the purchase, they issued bonds in the amount of $3,500,-000.00, seven hundred thousand dollars more than

the purchase price. Let's ask why those bonds sold in Seattle for $106.00, but the P. U. D. got only $100.00. Let's find out who got a cut, and how much, for putting over that sweet deal for the Power Trust.

"Then let's find out why another P. U. D. is now employing the manager of the Grays Harbor set-up to act as an 'advisor' at a high fee. Let's find why a certain P. U. D. gave a $5000.00 'retainer' to a public official who, if not properly 'persuaded,' might have inconveniently dropped a monkey wrench into their proposed purchase of power trust properties at an exorbitant figure. Let's ask why another P. U. D. paid, and charged to its expense account, the campaign expenses of a public official.

"Let's find out, to put it baldly and straight-from-the-shoulder, if it isn't the Power Trust that pulls the P. U. D. strings, with the Grange, the so-called 'Grange Power Committee,' Senator Bone and a lot of other puppets merely doing what they're told.

"By all means, Grange News, let's have an investigation—and let's have it before you and the Power Trust put over another Street-car Deal on us. Let's find out just who is opposing Initiative 139, and why. And if it's the Power Trust that's under suspicion, let's start looking for it where we're most likely to find it. That, we suspect, will be in the back rooms of the P. U. D. movement, conspiring to sell us (if it can kill Initiative 139 and the perils of voter disapproval) its obsolete and failing power properties, just as it once sold us the Seattle street railway, at an outrageous profit."

As special damages are not alleged, the sole question presented for determination on this appeal is whether or not the publication is libelous *per se.*

Rem. Rev. Stat. (Sup.), § 2424 [P. C. § 8953], provides:

"Every malicious publication by writing, printing, picture, effigy, sign radio broadcasting or which shall in any other manner transmit the human voice or reproduce the same from records or other appliances or means, which shall tend:—

"(1) To expose any living person to hatred, contempt, ridicule or obloquy, or to deprive him of the benefit of public confidence or social intercourse; or

"(3) To injure any person, corporation or association of persons in his or their business or occupation, shall be libel. . . ."

Malice is not an essential element of civil libel. *Wilson v. Sun Pub. Co.*, 85 Wash. 503, 148 Pac. 774, Ann. Cas. 1917B, 442; *Hollenbeck v. Post-Intelligencer Co.*, 162 Wash. 14, 297 Pac. 793; *Blende v. Hearst Publications, Inc.*, 200 Wash. 426, 93 P. (2d) 733, 124 A. L. R. 549. But, aside from that, the publication proscribed as criminal libel in the cited statute, in so far as it pertains to living persons, also constitutes libel *per se*. As stated in *Graham v. Star Pub. Co.*, 133 Wash. 387, 389, 233 Pac. 625: ". . . any publication which falsely charges a person with the commission of a crime or comes with[in] § 2424, Rem. Comp. Stat. [P. C. § 8953], is libelous *per se*, . . . "

In *Wilson v. Sun Pub. Co., supra*, Judge Ellis, the author of the opinion, commented on this statute as follows:

"Eliminating the statutory element of malice, either actual or implied, an essential only of criminal libel, this definition meets the essentials of libel actionable *per se* as generally recognized in civil actions for damages. Newell, Slander and Libel (2d ed.), p. 43."

In *Miles v. Wasmer, Inc.*, 172 Wash. 466, 20 P. (2d) 847, it was said, p. 469, that

"Defamatory words spoken of a person, which in themselves prejudice him in his profession, trade, vocation or office, are slanderous and actionable *per se*, unless they are either true or privileged."

It was alleged in the amended complaint that appellant held various public utility district offices, and that the imputations of the published article were

peculiarly applicable to him in his official capacities. With reference to defamation of a public officer, we quote the following from 3 Restatement of the Law of Torts, p. 177, § 573:

"One who falsely and without a privilege to do so, publishes a slander which ascribes to another conduct, characteristics or a condition incompatible with the proper conduct of his lawful business, trade, profession, or of his public office whether honorary or for profit, is liable to the other.

"Comment:  [b, p. 178]  The rule stated in this Section is applicable to public officers, whether executive, administrative, judicial, or legislative officers and whether of the city, state, or national government and to candidates for such an office irrespective of present incumbency.  It is immaterial whether the office is honorary or for profit."

It should be noted that, while the rule of the foregoing section pertains to *slander*, it is expressly stated in the comment (e, p. 168) under § 569 that the rule is applicable also to the *libel* of a person in his business, profession, or office.

This court has often held that a publication which imputes to a public officer entrusted with a position of public interest charges of misconduct in office, want of official integrity or fidelity to public trust, is libelous *per se.*  *Byrne v. Funk,* 38 Wash. 506, 80 Pac. 772; *Quinn v. Review Pub. Co.,* 55 Wash. 69, 104 Pac. 181, 133 Am. St. 1016; *McKillip v. Grays Harbor Pub. Co.,* 100 Wash. 657, 171 Pac. 1026; *Miles v. Wasmer, Inc., supra.*  In *Quinn v. Review Pub. Co., supra,* the following is quoted with approval from Newell, Defamation, Slander & Libel, p. 69:

" 'So too, it is libelous to impute to any one holding office that he has been guilty of improper conduct in office, or has been actuated by wicked, corrupt, or selfish motives.' "

268

Respondents urge that, in the determination of the question before us, we should consider only the contents of the published article and should exclude from our consideration the extrinsic circumstances pleaded in the amended complaint. In this connection, they particularly direct our attention to the following language of *Graham v. Star Pub. Co., supra,* quoted with approval in *Blende v. Hearst Publications, Inc., supra:*

"We have stated the answer to be that . . . the determination of whether a given article is libelous *per se* is one for the court to make, and in doing that the article should be read as an entirety and considered in its natural and obvious sense and not extended by the conclusions of the pleader, and the defamatory matter must be certain and apparent from the words themselves."

While it is true that the meaning of the words as published cannot be altered or extended by conclusions of the pleader, yet the ultimate test as to whether or not they are defamatory is the sense in which they would ordinarily and reasonably be understood by the recipients. 3 Restatement of the Law of Torts, p. 147, § 563; *Miles v. Wasmer, Inc., supra.*

In determining how the recipients would understand the words used, account may be taken of the circumstances under which they were published in so far as they were known to the recipients. It is proper to allege in the complaint that the words were published of and concerning the plaintiff and with reference to extrinsic circumstances, upon which their peculiar applicability to the plaintiff depends. Words which are harmless in themselves may be defamatory in the light of surrounding circumstances. 3 Restatement of the Law of Torts, pp. 149, 150, § 563, comments e, f; 33 Am. Jur. 99, § 85.

In *Lathrop v. Sundberg,* 55 Wash. 144, 104 Pac. 176,

25 L. R. A. (N. S.) 381, the communication complained of as libelous did not mention the plaintiff, and, although special damages were not claimed, this court considered allegations made in the complaint to the effect that plaintiff was a licensed osteopath and had been practicing his profession in the particular building to which the communication referred, and that it was applicable to him in his professional capacity.

Here, the appellant stated in his amended complaint the public offices which he had held, what his duties were with reference to them, and the circumstances, in that connection, under which the article was published, all of which circumstances, he expressly alleged, were known to and understood by the readers of respondents' newspaper. When these explanatory circumstances, the truth of which was admitted by the demurrers, are taken into consideration for the purpose and to the extent warranted by the principles which we have just discussed, we think the published article was libelous *per se*. It charged appellant, as a public utility district officer and representative, of being *a confessed tool of Wall street,* thus plainly inferring that he admittedly was in the service of financial institutions, the interests of which were generally understood to be inimical to those of his constituents. It imputed to him a lack of integrity and fidelity to his public trust; it tended to expose him to hatred, contempt, and obloquy, and to deprive him of the benefit of public confidence.

We shall not discuss the numerous cases from other jurisdictions cited in the briefs. In the words of Judge Fullerton, speaking for the court in *General Market Co. v. Post-Intelligencer Co.,* 96 Wash. 575, 165 Pac. 482:

"These we think it unprofitable to review. It would be to do no more than emphasize a condition already confessed; namely, that the courts are widely divergent

on the question as to what matters published will constitute libel actionable *per se."*

The order of dismissal is reversed, and the cause remanded with direction to overrule the demurrers to the amended complaint.

ROBINSON, C. J., MAIN, STEINERT, and MILLARD, JJ., concur.