[No. 33346. Department Two. April 19, 1956.]

SAMUEL LAMANNA, *Respondent and Cross-appellant,* v.
SCOTT PUBLISHING COMPANY *et al., Appellants.*[1]

[1]Reported in 296 P. (2d) 321.

*Gavin, Robinson & Kendrick, Halverson & Applegate, Alan A. McDonald,* and *Fulk & Leeper,* for appellants.

*Tonkoff, Holst & Hopp* and *Edward B. Critchlow,* for respondent and cross-appellant.

*Wright, Innis, Simon & Todd* and *Tanner, Garvin & Ashley, amici curiae.*

ROSELLINI, J.—This is another in a series of cases arising out of the dissension which appears to have prevailed in the area of Kennewick since the turn of the decade. (See *Owens v. Scott Publishing Co.,* 46 Wn. (2d) 666, 284 P. (2d) 296; *In re Black,* 47 Wn. (2d) 42, 287 P. (2d) 96; *In re Coates,* 47 Wn. (2d) 51, 287 P. (2d) 102; *In re Board of Directors of Kennewick School Dist. No. 17,* 47 Wn. (2d) 56, 287 P. (2d) 105; and *Gaffney v. Scott Publishing Co.,* 35 Wn. (2d) 272, 212 P. (2d) 817). It is an action brought by the former business manager and clerk of the board of Kennewick school district No. 17 of Benton county, against the Scott Publishing Company and Glenn Lee, its secretary and chief executive officer, based upon an alleged libel published by the defendants in the Tri-City Herald on September 25, 1952.

The action was instituted in Benton county, but on motion of the defendants, venue was transferred to Spokane county, where the case was tried. The jury returned a verdict of $15,600 general damages, and $14,000 special damages. Determining that the latter amount was based on speculation and conjecture, the trial court set aside the verdict for special damages, but entered judgment on the verdict for general damages. Both plaintiff and defendants have appealed.

The amended complaint sets forth the article alleged to be libelous, as follows:

"BOOT THEM OUT"
"Nothing about the Kennewick school situation is more

shameful than the announcement today by Sam Lamanna, clerk of the school board, that the recall election has failed.

"Kennewick citizens and residents of the Tri-City area are familiar with the name of Lamanna. The clerk of the board is facing criminal charges in Benton County Superior Court for alteration of a public document without knowledge or consent of the signers.

"He also gave damaging testimony in regards to himself during a public hearing on school matters conducted by the state auditor's office in April.

"But because he belongs to the school clique that citizens have been trying to remove for long months, he still continues in office. He is not only clerk of the board, but he is also listed as an assistant superintendent and business manager for the district.

"Now he has announced that the recall election has failed. But he has qualified this statement by adding that HIS decision will stand unless court action is taken to force him to do otherwise.

"Court action is being taken, but today we are witnessing the spectacle of a public servant who has set out to wreck and to stop the wishes of a great majority of the residents of a school district when he should be neutral in the matter.

"This man is a public employe. How has he misused his office? Here are a few facts:

"State law orders that the canvassing of recall election petitions should be done not less than five and not more than ten days following their filing with the clerk of the board (Lamanna).

"Thus, by law, the petitions originally should have been canvassed not later than Sept. 22.

"They were canvassed on Sept. 25.

"Lamanna himself had questioned the manner in which the petitions were certified by the city clerk and the county auditor.

"He asked the Benton County prosecuting attorney for advice and was told on Monday to return the petitions to the city clerk and county auditor and have them recertified.

"He did that on Tuesday.

"But the prosecuting attorney also wrote to him and told him verbally that the NEW DATE FOR THE CANVASSING WOULD BE THE DATE THE PETITIONS WERE RESUBMITTED.

"What does that mean? It simply means that Lamanna has instructions from the prosecuting attorney—given at Lamanna's request—NOT to canvass when he did.

"Two things made the clerk of the board disregard his instructions and act immediately. This is what they are:

"1. An attorney general's ruling said that the recall forces could add more names to their petitions.

"2. There were approximately 60 additional signatures on the original petitions that had not been certified by the city clerk.

"The Kennewick city attorney told the city clerk to certify the additional names, but Lamanna refused to turn the petitions over to her when she asked for them on Tuesday, Sept. 23.

"The answer to his action is simple. Even with the so-called 'withdrawals' of names there were more than enough signatures to call the election.

"But Lamanna and Black knew they had to stop that recall and they have attempted to do it under the guise of 'withdrawals.'

"This is equally shocking because state law makes No provision for taking names off of a recall petition.

"Lamanna said today that he has heard of a case where it was done and the State Supreme Court said it was okay.

"But each case is different. Our courts interpret the law. It is the job of public officials to obey the law as written.

"And what is the law in this matter? The Benton County prosecutor wrote Lamanna on Sept. 18, 1952, that No Law Exists to permit taking names off of a recall petition.

"Here are the exact words that Lamanna received:

" 'The attorney general advises that there is no statutory authority to allow the removal of signatures from a petition after said petition has been filed with a certified authority.'

"Could anything be clearer than that?

"Citizens of Kennewick know the problem. They know Lamanna has no voice. When members of the recall committee asked to see their petitions last week Lamanna had to walk into Black's office and ask the superintendent for them.

"The trickery and deceitfulness displayed here, in an effort to thwart the public interest is shocking. But it is typical of the type of operation under Black. Citizens can expect such goings on as long as Black and his gang are able to operate on the public payroll and on public time.

"Their slipperyness helps delay the housecleaning that is needed. Just as sure as night follows the day, it is coming, and soon."

The defendants assign error to the trial court's denial of their motion to dismiss, made at the close of the presentation of their case, contending that the evidence clearly established the substantial truth of the publication.

There was considerable conflict in the testimony concerning the announcement by Lamanna that the recall election had failed, reporters from the Tri-City Herald and the competing newspaper testifying that he had made a statement, and Lamanna denying it. Regarding the criminal charges, the evidence showed that the Tri-City Herald had been active in encouraging the prosecuting attorney to bring these charges and that the superior court, subsequent to the publication of the article on September 25th, had dismissed the charges after hearing the evidence offered by the prosecution.

It was established that Lamanna had testified at a public hearing on school matters, conducted by the state auditor's office, but whether or not the testimony was "damaging" seems to have been a matter of opinion.

In regard to the recall matter, it appears from the evidence that the petitioners had failed to have the petitions properly certified before filing them with Lamanna, the clerk of the board. Lamanna had requested legal advice from the prosecutor's office, and was advised that the petitions should be returned to the city clerk and county auditor for recertification. It appears that this was not the duty of the clerk of the board but of those who had originally filed the petitions. Nevertheless, Lamanna, as an accommodation to the filers, took the petitions to the proper officers to have them recertified. In the meantime, the date originally set for canvassing the petitions had passed. Lamanna had received conflicting advice as to the proper new date for canvassing; he was advised in one communication that the date should be not less than five nor more than ten days from the date the petitions were returned properly certified, and in another, that it should be the date they were returned. He decided to follow the latter instruction; but since the petitions were returned late in the afternoon of the 24th, he felt that it was too late to notify all of the

parties who were entitled to be present in time to secure their attendance on that day, and consequently he set the canvassing for the following morning. The representatives of the petitioners and the school board members whose recall was being sought were notified of this new date.

On the morning of the 25th, representatives of the board members were present and willing to proceed with the canvassing. Representatives of the petitioners appeared and protested the canvassing, refused to participate in it, and advised Lamanna that they were getting out a show cause order to prevent the canvassing. Lamanna had also been advised that the board members were seeking the aid of the superior court to restrain the calling of an election. According to Lamanna's testimony, he thereupon abandoned the canvassing and placed the petitions in a safe in the office of the school district, and this testimony was corroborated by the representatives of the board members who were present.

In regard to the removal of the names from the petition, the prosecutor's office advised that the attorney general had, by telephone, stated that there was no statutory authority for removing names from a petition. However, Lamanna was advised by the law firm employed by the school board that such a procedure had been approved by the supreme court in a Washington case.

The attorney general had further advised, according to the prosecuting attorney's letter to Lamanna, dated September 18, 1952, that there would be no authority to allow additional signatures to be placed on any of the filed petitions, but that there was nothing to prevent the filing of additional signatures on new petitions. However, no new petitions should be recorded once the board started its canvassing.

It was true that there were sixty additional signatures on the petitions which had not been certified when the petitions were originally filed with Lamanna. The city clerk testified that she had refused to certify them because of the press of other work at the time, whereas other witnesses testified that she had refused on the ground that she was not

authorized to certify them, that the time for certification had passed. When the petitions were resubmitted to her, she again failed to certify these signatures. She was later advised by the city attorney to go to Lamanna and ask for the petitions so that she could certify these additional names. He refused to give them to her, on the ground that he was not authorized to relinquish the petitions once they had been filed with the clerk of the school board, which fact was not disputed.

Lamanna testified that while he was friendly with his superiors, Superintendent Black and the members of the school board whose recall was sought, he had endeavored at all times to remain neutral in carrying out his duties as clerk of the board; that there was a great deal of confusion as to the proper manner of certifying the petitions and setting the date for canvass, as well as the removal and addition of signatures; that he was besieged with threats of court action by representatives of both sides of the controversy, and that whatever he had done had been done in good faith. Witnesses for the defense admitted that Lamanna had been courteous and co-operative, though they objected to the way he had handled the recall.

At the time the article in question was published, the town of Kennewick was divided into two factions, those favoring the retention of the superintendent and the board members who supported him, and those desiring to "boot them out." The Tri-City Herald was aligned with the latter faction and, it appears, was instrumental in kindling antagonism between the factions. The secretary, Glenn Lee, who stated that he had approved the article before it was published, announced at the trial that he was proud of it.

There was considerable testimony about the handling of surplus war materials which the school district had obtained from the government, the approval of vouchers for the expenses of the superintendent, and certain practices of the school board, which were regarded as irregular. It was not shown, however, that Lamanna was responsible for any of these matters, his duties being largely ministerial.

█ Viewing this evidence, it is plain that the truth or falsity of the libelous publication was a question for the jury, and the trial court committed no error when it refused to dismiss at the close of the defendants' case.

The appellant further contends that the trial court erred in submitting to the jury the question of· whether the article was libelous, after instructing that certain unspecified portions of the article were libelous as a matter of law; and that it erred in giving certain instructions and refusing to give·certain other requested instructions on the privilege of fair comment.

In its instruction No. 3, the trial court gave the jury the statutory definition of libel (Laws of 1935, chapter 117, § 1, p. 329 [*cf.* RCW 9.58.010]):

"Every publication by writing or printing which shall tend to expose any person to hatred, contempt, ridicule, or obloquy, or to deprive him of the benefit of public confidence or social intercourse, or to injure any person in his business, occupation, or profession, shall be libelous per se; 'per se' meaning libelous in itself without other proof."

The court then instructed the jury that certain portions of the article in question were libelous on their face, and therefore presumed to be false, without pointing to any specific statement contained in the article.

The jury was asked to answer two interrogatories:

"Have the defendants proved by a preponderance of the evidence the substantial truth as to each and every libelous statement made in the article of September 25, 1952?" And if not,

"Do you find by a preponderance of the evidence that there was an abuse of the privilege of fair comment and criticism?"

The jury had previously been instructed that if the publication was made with malice, it would constitute an abuse of the privilege.

The jury answered the first interrogatory in the negative, and the second in the affirmative.

The defendants complain that the court confused the jury by first advising it that certain portions of the article were

libelous *per se,* without specifying which portions, and then allowing the jury to determine for itself which statements in the article were both libelous and false.

In *Luna de la Peunte v. Seattle Times Co.,* 186 Wash. 618, 59 P. (2d) 753, 105 A. L. R. 932, we were asked to answer a similar contention. In that case, the court had instructed the jury that certain specified portions of the article in question were libelous *per se*; and in another instruction the jury was told to determine what other portions of the article were libelous and whether they were true. We pointed out that the instruction complained of was more favorable to the publisher than otherwise, for the court had left to the jury something which it should itself have determined, namely, that the article, when read as a whole, was libelous *per se.* (In *Gaffney v. Scott Publishing Co., supra,* we again recognized that the question of whether a publication is libelous *per se* is for the court.)

The same principle applies here. The article, when read as a whole, is libelous *per se,* and the court should have so instructed the jury. That it failed to do so is not an error of which the defendants can complain.

The article contains the statement, or insinuation, that the plaintiff had misused his office, a statement which finds little support in the record. An imputation of misconduct in office, want of official integrity or fidelity to public trust, if false, is a libel as a matter of law. *Gaffney v. Scott Publishing Co., supra.* The jury's answer to the first interrogatory can be supported on the basis of this evidence alone.

Since the jury found that the libelous statements contained in the article were not substantially true, and this finding is supported by the evidence, under the rule enunciated in the recent case of *Owens v. Scott Publishing Co., supra,* the plaintiff is entitled to recover. As stated in that case, in order to be privileged, a libelous criticism or comment concerning a public official must be based on true facts. Consequently, the assignments of error directed to the instructions given by the court on the privilege of fair comment, and the refusal to give requested instructions re-

garding this defense, need not be considered. We have, however, examined the instructions and the arguments directed toward them and note that, in the light of the *Owens* case, any error contained in the instructions given is in favor of the defendants, since the jury was instructed that even though the comments or criticisms contained in the article were based on untrue facts, they might nevertheless be privileged. Furthermore, the affirmative finding of malice in answer to the second interrogatory, based as it was upon substantial evidence, destroys the privilege. See *Owens v. Scott Publishing Co., supra,* and authorities cited therein.

The defendants also complain of the court's failure to give a requested instruction regarding the constitutional guarantees of freedom of the press. This phase of the law was adequately covered by the instruction given, and the proposed instruction added nothing to its substance.

Finally, the defendants complain that the verdict was so excessive that a new trial should have been granted. The plaintiff in his original complaint asked $50,000; he was awarded $15,600. He testified that he had suffered humiliation, embarrassment and disgrace, that he had spent sleepless nights, and had lost considerable weight as a result of the publication of the article in question. As we said in *Coffman v. Spokane Chronicle Publishing Co.,* 65 Wash. 1, 117 Pac. 596, there is no exact measure of damages to be awarded in an action for libel. It is within the special province of the jury to determine and fix the award. The defendants have not pointed out wherein the award was excessive, nor do we find anything in the record to indicate that the jury was motivated by passion and prejudice. The case was tried in a court far removed from the scene of the controversy, and the members of the jury were not acquainted with the parties. We find no error in the court's refusing the defendants' motion for a new trial.

On his cross-appeal, Lamanna maintains that the court erred in setting aside the verdict for special damages for loss of earnings in the amount of $14,000, contending that there was evidence to support the verdict.

■ In ruling upon a motion for judgment n.o.v., no element of discretion is involved, and the trial court can grant such motion only when it can be held as a matter of law that there is no evidence nor reasonable inference from the evidence to sustain the verdict. *Johnson v. Department of Labor & Industries,* 46 Wn. (2d) 463, 281 P. (2d) 994.

In its memorandum opinion, the trial court gave the following reasons for setting aside the verdict:

"Since the trial has been concluded, the Court has had an opportunity to consider all of the evidence, including the testimony of the defendants' witnesses, on the question of loss of job and loss of future earnings by the plaintiff. When evaluated, the evidence given by Mr. Coates [superintendent of a nearby school district and former Kennewick Jr. high school principal, who testified that in his opinion Lamanna would have difficulty obtaining another job as business manager of a school district] was largely theoretical and conjectural in nature. Giving the best interpretation to Mr. Lamanna's testimony, the most that can be said is that Mr. Lamanna was at first only suspended, and his pay continued, and only after his refusal to assist with the preparation of the next year's budget, was he finally discharged and removed from the payroll. Under the terms of his contract, he would only be entitled to compensation until June 30th, and in the absence of the tenure law in this State, he had no right to assume that the School Board would renew his contract. . . . His testimony as to his search for another school job could hardly be called more than a token effort. He did not renew his teacher's certificate, and he admitted there were no vacancies in the State of Washington, to his knowledge, as a business manager. The testimony of the individual members of the Board of Directors was to the effect that Mr. Lamanna's discharge was for reasons other than the publication of the libelous article by the defendant publishing company."

The reasons offered by the school board in support of its suspension and discharge of Lamanna may be found in *In re Board of Directors of Kennewick School District No. 17, supra.* They are substantially those which the trial court referred to in its memorandum opinion.

In *Lynch v. Republic Publishing Co.,* 40 Wn. (2d) 379, 243 P. (2d) 636, the plaintiff asked special damages based upon

his allegation that, as a result of the libel published by the defendant, he had been deprived of his position as a police judge. We held that, in view of the many factors which enter into a political campaign, the jury could only speculate as to whether the plaintiff's failure to win re-election as a justice of the peace was a result of the publication and whether, had he been re-elected, the mayor would have reappointed him to the police judgeship. We sustained the trial court in striking the item of special damages from the complaint.

The uncertainty inherent in that situation is present here. The record contains no evidence that Lamanna lost his job six months after the publication of the article because of the unfavorable publicity, nor that his inability to secure another position as a business manager was due to the publication of the article. No doubt the jury was influenced by the fact that the publisher of the article was instrumental in obtaining Lamanna's suspension. However, this does not establish a causal relation between the publication of the article and the loss of employment. The trial court correctly concluded that the verdict for special damages was based upon speculation and conjecture and refused to enter judgment upon it.

The judgment is affirmed. Each party will pay his own costs.

HAMLEY, C. J., MALLERY, HILL, and WEAVER, JJ., concur.

July 3, 1956. Petition for rehearing denied.