[No. 34672. *En Banc.* October 8, 1959.]

RALPH PURVIS, *Appellant*, v. BREMER'S, INC., *et al.*,

*Respondents.*[1]

[1]Reported in 344 P. (2d) 705.

*Tonkoff, Holst & Hopp* (*J. P. Tonkoff*, of counsel), for appellant.

*Helsell, Paul, Fetterman, Todd & Hokanson, Ursich & Jensen*, and *Arthur & Hanley*, for respondents.

DONWORTH, J.—This is an action for libel. Three separate demurrers, filed by defendants against the third amended complaint, were sustained. The plaintiff elected not to plead further, and the trial court entered judgment of dismissal. Plaintiff appeals.

The alleged libelous article is an advertisement which appeared in four newspapers of general circulation in Kitsap county during a political campaign in which the plaintiff was a candidate (and a successful one) for re-election to the state legislature. We set out the advertisement *in haec verba*.

### "TAXPAYERS BEWARE
### RALPH PURVIS IS TRYING TO PUT
### HIS HAND IN YOUR POCKET

"Just when the people of Kitsap County thought they had the Great PUD Deal laid quietly to rest, one Ralph Purvis, attorney and legislative watchdog for the PUD Lobby, has presented a bill. A big bill. Mr. Purvis says the Kitsap PUD owes him $10,500.00. He says it is for legal services—rendered several years ago.

"The taxpayers out of whom Purvis hopes to collect this windfall should understand something about the bill they have been handed by Mr. Purvis. Incidentally, Mr. Purvis wants these same taxpayers to send him to Olympia for a second term in the State House of Representatives.

"Mr. Purvis wants to go to Olympia with his fellow Democrat, Mr. Henry Brown, another PUD zealot who has cost Kitsap County taxpayers thousands of dollars. No wonder Mr. Brown and Mr. Purvis wish to go to Olympia as your representatives to fix up the PUD laws so they can milk the taxpayers of additional thousands.

"This latest assault on the public purse is so bold, so brazen, it must be clearly understood by the taxpayers who will have to pay the $10,500.00 claim if Mr. Purvis is successful in pressing it. It should be realized that the Kitsap PUD has no funds on hand to pay this Purvis claim. If it should come to pass that the PUD must pay the amount, it would be necessary for the PUD commissioners to make a tax levy against your homes and property to pay the bill. There is only one place the PUD can get any money—out of your hide by means of property taxes.

"The PUD of this county already has spent $66,547.95 of the public's money in foolhardy schemes. The Kitsap PUD today hasn't a dollar's worth of property to show for this lavish expenditure of your money. Now Mr. Purvis wants you to dig down deeper for $10,500.00 in lawyer fees. He wants to add insult to injury.

"Mr. Purvis has been associated with Mr. Guy Myers, the high-priced fiscal agent who was arranging the 107-million-

dollar deal for Kitsap and several other PUD'S to purchase the Puget Sound Power & Light Company.

"Mr. Myers' contract with the Kitsap PUD provided that he would have to pay all legal and engineering fees in connection with the deal. Mr. Purvis should look to Mr. Myers for his fee, if he has one coming, because everything Mr. Purvis did as a lawyer in connection with the Kitsap PUD was done to further the PUD purchase of the power company's properties.

"We feel that this effort of Purvis to collect a big fee on a 'dead horse' financial scheme should be exposed. We feel also that the public should be made fully aware of the part both Henry Brown and Ralph Purvis have played in this scheme, both in this county and in the legislature where both have served their PUD masters slavishly.

"We believe that a political campaign is indeed the proper time to bring these matters to the attention of the voters, so they can understand the issues at stake and judge the personalities and characters involved.

"Please read our advertisements the rest of the week in the Bremerton Sun to learn the amazing details of this latest PUD raid on the Kitsap County Treasury . . . sometimes known as 'The Ralph Purvis Relief Bill.'

"This series of advertisements Paid for by KITSAP COUNTY YOUNG REPUBLICAN CLUB
Richard Rylander, Pres., and Robert Phalen, Sec'y."

The third amended complaint alleged that the defendants James McCallum and Jack Henry Rogers were agents and employees of the defendants Bremer's, Inc., and Edward Bremer, and were acting in the scope and course of their employment, and that McCallum and Rogers, together with the defendants Thor Romstad, Robert Phalen, and Richard Rylander, and each of them, did, with malice, write and publish the advertisement in the four newspapers; and that it was false and untrue and was known by the defendants to be false and untrue.

It was further alleged that, at all times referred to in the third amended complaint, the plaintiff was an attorney engaged in the practice of law in Bremerton, Kitsap county, and a member of the state legislature; that all of the statements in said advertisement exposed the plaintiff to hatred and contempt, causing him mental anguish and distress, and

deprived him of the benefit of public confidence, and injured him in the practice of his profession, thereby causing him special damages in the sum of $75,000, and general damage in the sum of $150,000.

There are three additional paragraphs in which the plaintiff alleges what the readers of the newspapers understood certain statements to mean, and these we shall consider in connection with a consideration of the various statements now claimed to be libelous *per se.*

 Unless a publication constitutes a libel *per se,* special damages must be alleged and proved. In the present case, the general allegation that the publication has "injured plaintiff in the practice of his profession, thereby causing plaintiff special damage in the sum of $75,000.00" is insufficient to place the issue of special damages before the court. The items of special damage must be stated with particularity. *Denney v. Northwestern Credit Ass'n,* 55 Wash. 331, 104 Pac. 769 (1909); *Velikanje v. Millichamp,* 67 Wash. 138, 120 Pac. 876 (1912); *Fowler v. Curtis Publishing Co.,* 182 F. (2d) 377 (D. C., 1950); see Anno., 86 A. L. R. 848.

There being no proper allegation of special damages, unless the statements in the advertisement are libelous *per se,* the third amended complaint fails to state a cause of action.

There is a general allegation that the advertisement "was false and untrue and was known to be false and untrue by the defendants." The complaint, however, specifically admits the truth of some of the statements, and of some we have judicial knowledge, as shown by an opinion of this court. *Purvis v. Public Utility Dist.,* 50 Wn. (2d) 204, 310 P. (2d) 233 (1957).

 However, except as judicial knowledge or the allegations of the complaint establish the contrary, we must, for the purpose of passing upon the demurrer to the third amended complaint, assume the falsity of the statements contained in the advertisement. *Yelle v. Cowles Publishing Co.,* 46 Wn. (2d) 105, 278 P. (2d) 671, 53 A. L. R. 1 (1955).

The statements in the advertisement, which the plaintiff urges to be libelous *per se,* which we have designated A through H, will be considered *seriatim.*

Following each statement we have inserted the plaintiff-appellant's contention with reference to that statement, supplemented with any allegations in the third amended complaint, by way of innuendo or explanatory background. This is not to be interpreted as the views of the court.

A. "TAXPAYERS BEWARE
 RALPH PURVIS IS TRYING TO PUT
 HIS HAND IN YOUR POCKET"

It is urged that those headlines are an insinuation that the plaintiff is not worthy of trust and confidence, and that his motive is to wrongfully take money which belongs to the taxpayers.

B. "Just when the people of Kitsap County thought they had the Great PUD Deal laid quietly to rest, one Ralph Purvis, attorney and legislative watchdog for the PUD Lobby, has presented a bill. A big bill. Mr. Purvis says the Kitsap PUD owes him $10,500.00. He says it is for legal services— rendered several years ago.
"The taxpayers out of whom Purvis hopes to collect this windfall should understand something about the bill they have been handed by Mr. Purvis. . . ."

It is urged that the term "legislative watchdog for the PUD Lobby" implies that he uses his position in the legislature to further the interests of the public utility districts rather than the interests of the people of his district, who elected him, and the people of the state as a whole, whose interests he has an obligation to serve. It implies that he is wanting in official integrity and fidelity to a public trust. It is urged that, while it appears from our opinion in *Purvis v. Public Utility Dist.*, *supra*, that the plaintiff was attempting to collect a fee from the public utility district, and properly so, except to the extent that his claim was barred by the statute of limitations, the use of the word "windfall" suggests that he is trying to collect something he did not earn or had no right to expect.

C. ". . . Incidentally, Mr. Purvis wants these same taxpayers to send him to Olympia for a second term in the State House of Representatives."

While this statement was literally true at the time, it is said that, read in context with the entire advertisement, it

says in effect: can you imagine the effrontery of this man, who is trying to put his hand in your pocket, who is lacking in official integrity, who is unworthy of public trust, and who is trying to collect windfalls from the taxpayers, asking the voters to send him back to the legislature.

D. "Mr. Purvis wants to go to Olympia with his fellow Democrat, Mr. Henry Brown, another PUD zealot who has cost Kitsap County taxpayers thousands of dollars. No wonder Mr. Brown and Mr. Purvis wish to go to Olympia as your representatives to fix up the PUD laws so they can milk the taxpayers of additional thousands."

Of this statement, paragraph 9 of the third amended complaint says that it charged that this plaintiff has cost the taxpayers of Kitsap county thousands of dollars without rendering any service therefor, and that the plaintiff desired to be re-elected to the state legislature so that he could fix the PUD laws so as to enable him to milk the taxpayers of additional thousands, thereby charging that plaintiff, as an attorney, had received money from the taxpayers to which he was not rightfully entitled, and also charging that he planned, as a legislator and attorney, to obtain additional money from the taxpayers, without being entitled to the same for any services rendered; that the advertisement charged that the plaintiff had attempted, and would continue to attempt, to steal money from the taxpayers and the public utility district, and that the plaintiff had used, and intended to use, his official position as a Washington state legislator for his own private gain; that the statements contained in the advertisement were so understood, and were capable of being so understood by the readers thereof.

E. "This latest assault on the public purse is so bold, so brazen, it must be clearly understood by the taxpayers who will have to pay the $10,500.00 claim if Mr. Purvis is successful in pressing it . . . There is only one place the PUD can get any money—out of your hide by means of property taxes."

The plaintiff, in his brief as appellant, says of this statement that it imputes to

". . . plaintiff, past and present, a misuse of plaintiff's position as a practicing attorney and a representative of the

PUD in extracting money from the taxpayers and voters without rendering services in return."

F. "Now Mr. Purvis wants you to dig down deeper for $10,500.00 in lawyer fees. He wants to add insult to injury."

The plaintiff urges:

"The above statement directly accuses plaintiff of past and present dishonest motives and an intention to wrongfully extract money from the residents and voters of Kitsap County."

G. "Mr. Purvis has been associated with Mr. Guy Myers, the high-priced fiscal agent who was arranging the 107-million-dollar deal for Kitsap and several other PUD'S to purchase the Puget Sound Power & Light Company.

"Mr. Myers' contract with the Kitsap PUD provided that he would have to pay all legal and engineering fees in connection with the deal. Mr. Purvis should look to Mr. Myers for his fee, if he has one coming, because everything Mr. Purvis did as a lawyer in connection with the Kitsap PUD was done to further the PUD purchase of the power company's properties.

"We feel that this effort of Purvis to collect a big fee on a 'dead horse' financial scheme should be exposed. We feel also that the public should be made fully aware of the part both Henry Brown and Ralph Purvis have played in this scheme, both in this county and in the legislature where both have served their PUD masters slavishly."

Of this portion of the advertisement, paragraph 8 of the third amended complaint alleges that, for the period between March, 1949, and December 1, 1952, the plaintiff had acted as attorney for public utility district No. 1 of Kitsap county, during which period that body had entered into negotiations for the purchase of certain properties of Puget Sound Power & Light Company, and, in connection therewith, had engaged the services of Mr. Guy C. Myers; that all the above stated facts were well known to the readers of the Bremerton Sun (one of the papers in which the advertisement was published); that the advertisement charged that the plaintiff, as the attorney for the public utility district, was also engaged by and associated with Guy C. Myers as his attorney in connection with the negotiations for said purchase, thereby charging that the plaintiff, as an attorney,

had accepted employment which was inconsistent with his employment by said public utility district, and charged the plaintiff with wicked, corrupt, and selfish motives as an agent for the said Guy C. Myers, thus imputing to the plaintiff a course of double-dealing in connection with his professional standing as an attorney, and lack of fidelity to his client, Kitsap county public utility district; that the said advertisement was so understood as a criticism of the plaintiff's professional conduct as an attorney and would be capable of such interpretation by the readers of the advertisement.

H. "Please read our advertisements the rest of the week in the Bremerton Sun to learn the amazing details of this latest PUD raid on the Kitsap County Treasury . . . sometimes known as 'The Ralph Purvis Relief Bill.' "

It is alleged, in paragraph 10 of the third amended complaint, that the claim of the plaintiff for payment of legal fees due him from the public utility district is referred to as "The Ralph Purvis Relief Bill"; that these statements infer that the plaintiff is not successful in the practice of law and is in need of some bounty from the public, and said statements were so understood and were capable of being so understood by the readers of the advertisement.

Before considering the advertisement as a whole and the various portions of it claimed to be libelous *per se,* we must needs be clear as to what constitutes libel *per se.* The definition which we have frequently used is: A publication which tends to expose a living person to hatred, contempt, ridicule or obloquy, or to deprive him of the benefit of public confidence or social intercourse, or to injure him in his business or occupation, is libelous *per se.* RCW 9.58.010. *Ziebell v. Lumbermens Printing* Co., 14 Wn. (2d) 261, 127 P. (2d) 677 (1942). And, to business or occupation may be added profession or office. *Spangler v. Glover,* 50 Wn. (2d) 473, 313 P. (2d) 354 (1957).

In determining whether a publication can be defamatory, it must be construed in the sense in which it would ordinarily be understood by its readers. *Miles v. Wasmer, Inc.,* 172 Wash. 466, 20 P. (2d) 847 (1933). While

the reasonable meaning of published words cannot be altered or extended by the pleading of innuendo, the pleader may be able to add meaning to words by a pleading of the circumstances surrounding the publication.

However, there seems to be an erroneous impression that, to be libelous *per se*, the statements in a publication must be so clearly defamatory that it ceases to be a question of fact for the jury, and is a matter concerning which there can be no difference of opinion among reasonable men, and becomes a question of law to be determined by the court. To this impression we have contributed with statements that whether a writing is libelous *per se* is a matter of law. See *Gaffney v. Scott Publishing Co.*, 35 Wn. (2d) 272, 212 P. (2d) 817 (1949). The test actually is whether the language used concerning a person and his affairs must from its nature, or presumably will as its natural consequence, occasion him pecuniary loss. The publication of such language *prima facie* constitutes a wrong without any allegation or evidence of damage, other than that which is implied or presumed from the fact of publication. It is, therefore actionable without proof of damage, and is said to be libelous *per se.*

Like most general statements, our statement that whether a writing is libelous *per se* is a matter of law to be determined by the court, is subject to exceptions. Where the definition of what is libelous *per se* goes far beyond the specifics of a charge of crime, or of unchastity in a woman, into the more nebulous area of what exposes a person to hatred, contempt, ridicule or obloquy, or deprives him of public confidence or social intercourse, the matter of what constitutes libel *per se* becomes, in many instances, a question of fact for the jury. This is particularly true where the words relied on as libelous *per se* depend upon innuendo or upon extrinsic circumstances such as where they were published and who read them. See *Spangler v. Glover, supra.*

The rule in England is clearly stated in Gatley on Libel and Slander (1953) p. 124:

"Whether the words complained of are defamatory or not is a question of fact for the jury to decide. But there is always the prior question, Are the words capable of a de-

famatory meaning? and this is the question for the judge to determine."

That is also the generally recognized rule in the United States, as stated in 3 Restatement, Torts, 304, § 614:

"(1) The court determines whether a communication is capable of a defamatory meaning.

"(2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient."

 We come now to a consideration of the advertisement and the innuendo and the extrinsic circumstances alleged concerning it. The specific statements urged as being libelous *per se*, together with the plaintiff's contention concerning them, have been set out A to H, *supra*. Many of these statements do not impress us as being libelous *per se*, although they are in bad taste, and replete with hyperbole and exaggeration. There are, however, at least two statements which we believe are sufficient to raise a jury question. We refer to D and G.

In D it is stated that the purpose of the plaintiff in seeking re-election is "to fix up the PUD laws," so that he "can milk the taxpayers of additional thousands." A jury could find that a dishonesty of purpose is attributed to the plaintiff as a candidate for the legislature.

With reference to G, we see no criticism of the plaintiff as an attorney in the first two paragraphs. The plaintiff, his client, and Mr. Myers all had a common and legitimate, though highly controversial purpose. The point made is that Mr. Myers, and not the public utility district, should be responsible for any fee due the plaintiff. This is a matter of opinion; it may be wrong, but it is not libelous. However, we do see the possibility of libel *per se* in the concluding statement that the plaintiff as a legislator had served his "PUD masters slavishly." It is capable of the interpretation that he was not concerned in his votes in the legislature with the propriety or impropriety of the requests made of the legislature by the public utility districts. For a legislator to "slavishly" follow the dictates of some interest

other than the common good would be a betrayal of a public trust.

There may be others, but at least the two statements indicated seem to us capable of meeting our definition of a libel *per se*. The third amended complaint, therefore, states a cause of action.

If, instead of limiting our consideration to the various specific statements, we consider the advertisement as a whole, we find that in the headline it charged that the plaintiff "is trying to put his hand in your [the taxpayer's] pocket." In the text, plaintiff is described as a "zealot" who has "cost Kitsap county taxpayers thousands of dollars," not to mention $10,500 more that the plaintiff now wants to collect from the taxpayers as a "big fee on a 'dead horse' financial scheme" and which constitutes a "bold" and "brazen . . . assault on the public purse." Furthermore, it is charged that the plaintiff's motive in seeking re-election to the legislature is "to fix up the PUD laws" so that he could "milk the taxpayers of additional thousands," and that as a legislator he had served his "PUD masters slavishly."

A permissible implication from this language would be that the plaintiff, with a corrupt motive, has used his double status as legislator and attorney for the public utility district in an attempt to make an unearned private gain at the expense of the taxpayers, and would attempt to do so again if entrusted with another term in the legislature. A jury could well find the advertisement to constitute a charge of want of official integrity and of lack of those ethical principles that the public rightly expects to find in one who follows the profession of the law. If so, it tended to deprive the plaintiff of the benefit of public confidence and to injure him in his standing in his profession, and was, therefore, libelous *per se*.

The defendants, as respondents here, urge that even if the advertisement was libelous, it was privileged as constituting fair comment. Conceding that fair comment is a defense to be raised by answer, and that under certain

circumstances it can be raised by demurrer, we are satisfied that the plaintiff's allegation of malice precludes its consideration here on demurrer. Malice is not a necessary element of civil libel, and is immaterial upon the issue of whether published words are defamatory. However, proof of malice would destroy the defense of fair comment. *Lamanna v. Scott Publishing Co.*, 48 Wn. (2d) 683, 296 P. (2d) 321 (1956). See *Owens v. Scott Publishing Co.*, 46 Wn. (2d) 666, 284 P. (2d) 296 (1955). It follows that the defense of fair comment cannot be considered on demurrer where there is an allegation of malice.

It follows from what has been said that a jury might, under the allegations of the complaint, determine that the advertisement, in part at least, was libelous *per se*, and the trial court erred in dismissing the action.

Judgment of dismissal reversed.

WEAVER, C. J., MALLERY, ROSELLINI, OTT, and HUNTER, JJ., concur.

FINLEY and FOSTER, JJ., did not participate.

HILL, J. (dissenting)—I am in accord with the law as stated in the majority opinion. I dissent because, like the trial court, I see nothing that can be regarded as libelous *per se* in the advertisement which is quoted in its entirety in the majority opinion, and it is clearly fair comment.

It is undisputed that a court has the power to sustain a demurrer to a complaint in a libel action, when it is clear from the alleged publication that reasonable minds could find no inference therein which would amount to a libel.

The sufficiency of a complaint in a libel action brought by a public officer or a candidate for public office, based on statements or advertisements published by his opposition, cannot be considered in a vacuum. The sufficiency of the plaintiff's third-amended complaint must be considered against the background of the controversy between public and private power. That issue has been seriously debated upon the basis of the economic, social, and political philosophies involved.

But often partisans, more influenced by their preju-

dices and their emotions than the principles involved, have engaged in name calling with implications that no one in his right mind, and without some ulterior motive, could possibly be on the other side of the question. Thus to some champions of public power anyone who espoused the cause of private power was, as a bare minimum, a hireling of the power trust, an enemy of the people, and a millstone around the neck of progress; and, with an equal lack of restraint on the other side, the champions of public power were labelled socialists, demagogues, tax dodgers, and termites destroying the economic foundation of the Republic.

The plaintiff, Ralph Purvis, had ably championed the cause of public power. He was seeking re-election to the legislature; he was also attempting to collect an attorney's fee from the Kitsap county public utility district, which was then a nonoperating district; and, obviously, any fee which it paid would have to be from its only source of revenue, i.e., taxes.

Some of those opposing the re-election of Representative (now Senator) Purvis, apparently (but quite mistakenly) believing that he was vulnerable—both because he was suing for a fee, which would have to be paid from taxes, and because he had been a leader in the effort to develop a combination of public utility districts by which the Puget Sound Power and Light Company could be taken over in its entirety (as an alternative to possible piecemeal dismemberment)—attempted to exploit that situation with the paid advertisement published in several Kitsap county newspapers, which is now alleged to be libelous per se.

The plaintiff has made a blanket allegation of the falsity of the publication. Actually, the basic facts are either specifically admitted in the third-amended complaint, or were matters of common knowledge.

The fact that the plaintiff was claiming ten thousand five hundred dollars for legal services rendered the public utility district is set forth in his complaint in his action to recover for those services. That complaint was part of the record in this case in support of a motion to stay proceedings until the plaintiff's claim for legal fees had been fully litigated.

It was a matter of which the trial court could properly take notice. Parenthetically, one phase of the plaintiff's litigation over his fee is reported in *Purvis v. Public Utility Dist.* (1957), 50 Wn. (2d) 204, 310 P. (2d) 233, in which his right to the fee claimed was unanimously upheld, though his right to recover a portion thereof was barred by the statute of limitations.

He also specifically alleged that he was an attorney practicing law in Bremerton; that he was serving in the state legislature; and was, at the time of the publication of the advertisement alleged to be libelous, a candidate for re-election; that he served as attorney for the public utility district between March 1949, and December 1, 1952; that during that period the public utility district had engaged Mr. Guy C. Myers in connection with negotiations for the purchase of the properties of the Puget Sound Power and Light Company.

The plaintiff's blanket allegation of falsity of the publication cannot and should not be construed to cover these specific facts which he has affirmatively alleged to be true. Language used in a pleading should be construed as a whole to determine the intention of the pleader (*Spangler v. Glover* (1957), 50 Wn. (2d) 473, 313 P. (2d) 354); where there is ambiguity in the pleading, the specific allegation must control over the general allegation. *Cohen v. Cowles Publishing Co.* (1954), 45 Wn. (2d) 262, 273 P. (2d) 893.

What this advertisement actually says, behind its colorful language and discernible sneer, is that the plaintiff has presented a claim to the public utility district; that the taxpayers of Kitsap county will have to pay that claim, if it is successfully pressed; and that the party who, by contract, should actually be held to pay the plaintiff's claim is Mr. Guy C. Myers. That is a view which, no matter how mistaken, the plaintiffs were entitled to express. The advertisement says that not only has the plaintiff been an attorney for the public utility district, but he has also furthered the interests of the public utility district in his service in the legislature, and that he can be expected to continue to do so in the future, if re-elected. Believing in the public utility

district program, there is certainly nothing reprehensible in furthering it in the legislature. The advertisement says that this public utility district has been a costly and ill-advised venture for the taxpayers of Kitsap county, which is certainly a matter of opinion.

The merits of the public utility district and its past project of taking over the Puget Sound Power and Light Company in its entirety is the real theme of this article. The plaintiff is being attacked for taking a part in this controversial project, a part which the authors of this advertisement, in their own political judgment, do not approve. When it is said that the plaintiff "has cost Kitsap County taxpayers thousands of dollars," the meaning is obvious: he has supported a public project which "already has spent $66,547.95 of the public's money in foolhardy schemes" and "today hasn't a dollar's worth of property to show for this lavish expenditure of your money." That also was a point of view the authors were entitled to express; whether the "schemes" were foolhardy and whether the expenditures were "lavish" is a matter of opinion. When it is said that the plaintiff wants to be re-elected "to fix up the PUD laws so they [he] can milk the taxpayers of additional thousands," the meaning is equally obvious: He will continue to support the public utility districts in an effort to expand their activities. There is no imputation here that the plaintiff would "fix up the PUD laws" through any means other than the legitimate process of legislation.

The charge that inheres in this article is simply that the plaintiff has taken an unwise stand (or so it seems to the authors of the advertisement) upon a public issue. This is a standard form of political criticism, which certainly does not in itself impute any dishonesty, want of integrity, or lack of fidelity to a public trust. Expressions of opinion, even in the form of severe criticism, cannot be libelous *per se* if they clearly go only to the merits of a public controversy. Our political system requires a freedom of comment on the positions that a candidate for office has taken, or could be expected to take, on the public issues of the day.

The public utility district is a municipal corporation and

a public enterprise, created by the vote of the people of a county or a portion thereof, and intended to serve their interests by providing certain utilities. To say that the plaintiff has "served" the public utility district constitutes a criticism to some people and an accolade to others. A legislator is commonly expected to represent the best interests of his constituents in the legislature, and it would be far more defamatory to say that he ignored them or opposed their interests; on many issues what best serves the interest of constituents is debatable. Compare this present case with *Ziebell v. Lumbermens Printing Co.* (1942), 14 Wn. (2d) 261, 269, 127 P. (2d) 677, wherein it was held libelous *per se* to charge that a public utility district commissioner opposed his district's interests by being "*a confessed tool of Wall street.*"

The majority places, or so it seems to me, undue emphasis on the word "slavishly." It is purely a color word, like the word "lavish" in a phrase heretofore quoted. I am unable to read into "slavishly" a libel, where the surrounding context of the article gives no support to any imputation of wrongdoing. If it adds any meaning to this publication, it expresses the authors' doubt that one who has had previous public utility district connections could give disinterested consideration to further legislation concerning public utility districts.

This publication, read as a whole, or read part by part, fails to constitute any charge of want of official integrity or of failure of ethical principles. It simply is not the type of defamation from which the law will presume that damage will flow.

The writers have spoken unfavorably of the plaintiff, but they have not libeled him. Their opposition to the plaintiff as a candidate is obvious, but they are free to express it; this is the customary type of political appeal commonly heard before election day. I would sustain the demurrer to the third-amended complaint and affirm the judgment of the trial court.